**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
**Genon Mid-Atlantic, LLC,**                                :
**Genon Chalk Point, LLC,**                                 :
                                                            :
                        **Plaintiffs,**      :      **11 CV 1299 (HB)(FM)**
    **-against-**                                          :
                                                            :      **OPINION AND**
**Stone & Webster, Inc.**                                   :      **ORDER**
                                                            :
                     **Defendant.**       :
-----------------------------------------------------------x

**Hon. HAROLD BAER, Jr., District Judge:**

      Before the Court are motions by plaintiffs-counterclaim defendants Genon Mid-Atlantic,
LLC and Genon Chalk Point, LLC (collectively "GenOn") to enforce an order of this Court and
to quash a subpoena, as well as motions by defendant-counterclaim plaintiff Stone & Webster to
compel production of the subpoenaed documents and to disqualify GenOn's counsel and a
potential expert witness.  For the reasons that follow, GenOn's motion to enforce is GRANTED
and its motion to quash is DENIED; Stone & Webster's motion to compel is GRANTED and its
motion to disqualify is DENIED.

    **I.   Background**

      This lawsuit arises out of an agreement dated July 30, 2007 between GenOn and Stone &
Webster (the "Turnkey Agreement").  Under the Turnkey Agreement, Stone & Webster would
design and build certain air quality control systems known as "wet scrubbers" at three of
Genon's Maryland power plants.  The upgrade was necessary to ensure compliance with
Maryland's Healthy Air Act, which became effective January 1, 2010.  The amount payable to
Stone & Webster was not fixed, but was to be determined by applying a formula containing two
variables: (1) the target cost set out in the contract; and (2) the total amount of reimbursable costs
incurred by the contractor to complete the work (the "Actual Costs").  The formula is intended to
reward the contractor if its Actual Costs are less than the target, and discourage it from incurring
Actual Costs greater than the target.

      The target cost was subject to modification by "change order" on grounds set forth in the
Turnkey Agreeement.  Thus, the amount payable to Stone & Webster under the Turnkey
Agreement cannot be determined until the amount of all change orders are known, and Stone &

Webster has submitted to GenOn a final accounting of its Actual Costs.  Stone & Webster is contractually bound to provide this final accounting on an "Open Book" basis, which means essentially that it must make available all relevant "books, records, schedules, logs and electronic communications and data" in order to substantiate the costs and expenses incurred.  Turnkey Agreement §§12.11.2; 1.93.

In view of cost overruns projected at one point to exceed $100 million, GenOn filed this lawsuit seeking a declaratory judgment that it need not pay certain costs and invoices.  Its complaint focuses on allegedly improper billings by Stone & Webster that breach the Turnkey Agreement.  In 2009, Stone & Webster indicated that its Actual Costs would exceed the initial target cost.  GenOn exercised its audit rights under the Turnkey Agreement to obtain cost information, and concluded that the cost overruns were due to improper manipulation and abuse.  For example, GenOn points to data indicating that Stone & Webster billed it for excessive hourly wages (*e.g.*, charging $146/hour for 2125 hours logged by a "Safety Manager" who Stone & Webster paid $23/hour), and kept financial records for itself that differed from those created for GenOn.

In its counterclaim, Stone & Webster contends that, above and beyond what it has already received, it is entitled to an amount in excess of $200,000,000 under the Turnkey Agreement.  It posits that GenOn's failure to pay constitutes a breach of contract.

## II.  GenOn's Motion to Enforce the Order dated April 8, 2011

GenOn has moved to enforce a pretrial scheduling order, dated April 8, 2011 (the "Order") that required production of certain documents as they become available.  It claims that Stone & Webster's Rule 26 disclosures and initial document productions make clear that Stone & Webster has withheld discoverable documents that come within the scope of the Order. GenOn focuses on two categories of documents: final accounting documents and change order documents.  Stone & Webster has apparently provided a final accounting, but not what GenOn refers to as the underlying "source documents" to substantiate that accounting.  Similarly, GenOn has requested documents that support and substantiate the change orders that Stone & Webster has submitted or will submit.

As described above and on the record from oral argument, GenOn is entitled to such documents under the Turnkey Agreement, and requested them in its document requests. According to the parties, Stone & Webster has produced some of the underlying source

documents that exist in hard-copy, and is preparing to produce those that exist in electronic format.  Nonetheless, certain hard-copy documents remain outstanding, including but not limited to invoices from vendors, expense reports for salaried personnel, and non-confidential information contained in personnel records (*e.g.*, curricula vitae).  These and any other outstanding hard-copy source documents must be produced forthwith, and all source documents that exist in electronic format must be produced so as to conform to the timetable agreed or Ordered by the Court.

### III. The Motions to Quash and Compel

On April 12, 2011, Stone & Webster served a subpoena on FTI Consulting, Inc. ("FTI").  The documents it seeks relate to an audit that FTI performed in 2010 at GenOn's behest.  FTI was retained on September 24, 2009 by Alston & Bird, GenOn's legal counsel, to provide GenOn with its confidential analysis of Stone & Webster's accounting data.  In July, 2010, GenOn exercised its contractual rights to audit Stone & Webster's accounting, and requested that Stone & Webster provide FTI access to certain information.  There was some dispute around whether and how such access would be granted, but ultimately Stone & Webster and FTI executed a Confidentiality Agreement, dated September 30, 2010, and the audit proceeded.

According to Stone & Webster, who has now subpoenaed FTI, while Alston & Bird arranged and directed the audit, Stone & Webster was never made aware of the involvement of legal counsel; to the contrary, Stone & Webster shows that counsel's participation was not disclosed, and GenOn represented that GenOn, and not Alston & Bird, had retained FTI.  *See* Def.'s Opp'n to Mot. to Quash at 10.  According to Stone & Webster, the FTI audit contains the basis for GenOn's lawsuit, and is necessary to form its defense.  GenOn now moves to have the FTI subpoena quashed, or for a protective order on the basis of work-product privilege.  Stone & Webster moves to compel compliance with the subpoena, and also seeks to have FTI disqualified as an expert and Alston & Bird disqualified as attorneys.

The work product doctrine established in *Hickman v. Taylor*, 329 U.S. 495 (1947) and codified in FRCP 26(b)(3) precludes the discovery of "documents and tangible things that are prepared in anticipation for litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." FRCP 26(b)(3)(A). The privilege exists in order to "protect 'attorneys' mental impressions, opinions or legal theories concerning specific litigation from discovery."  *Strougo v. BEA Assocs.*, 199

F.R.D. 515, 520 (S.D.N.Y. 2001) (*citing Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 12 (2d Cir. 1989).   The party claiming work product protection bears the heavy burden of establishing that it applies.  *In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002*, 318 F.3d 379, 384 (2d Cir. 2003).

FTI's records in this case appear to serve a dual purpose: they were made pursuant to a contractual right in the ordinary course of business to determine what was due and owing, and they were made to assess the availability and strength of potential legal claims.  To determine whether the work product protection applies here, the court must decide if "in light of the nature of the document and the factual situation in the particular case, the document[s] can fairly be said to have been prepared or obtained *because* of the litigation."  *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998) (emphasis in original).  Where documents serve a dual purpose, the Second Circuit has "emphasized that the 'because of' formulation . . . withholds protection from documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation.  It is well established that work-product privilege does not apply to such documents."  *Id.*  The "nature" of the FTI records can be characterized as audit documents created pursuant to rights bargained for in a business contract.  When FTI approached Stone & Webster about the audit, it acted under authority of this contractually mandated audit procedure, and there was no representation that any portion of the audit went above and beyond what was contemplated by the Turnkey Agreement.  Neither has GenOn argued that the audit contains information beyond that which would have been recorded in the ordinary course under the contractual audit provisions.  I cannot conclude but that the documents would have been created in "essentially similar form" irrespective of GenOn's declaratory judgment action.  *Id.*

GenOn's arguments about the factual situation surrounding FTI's engagement are unavailing.  It asserts that projected delays – which, it admits, were not fully realized – and "possible accounting irregularities" made litigation a real possibility by the time FTI was engaged in 2009. Slavis Decl. ¶¶ 8, 12.   However, it concedes that it retained FTI to help "gather and analyze Stone & Webster's cost data and to evaluate GenOn's options for negotiation and litigation should negotiations prove unsuccessful."  Pl.'s Opp'n to Mot. Compel at 4.  As recognized by the Northern District of Illinois, under *Adlman*, even where an engagement letter states that an auditor is retained in anticipation of litigation, and even where

4

the party retaining the auditor has a reasonable, good faith belief that it might end up in litigation, the audit will not be protected where the documents would have been created in essentially similar form irrespective of litigation.  *See G.M. Harston Const. Co., Inc. v. City of Chicago*, No. 01-CV- 268 (JBM), 2001 WL 817855, *2 (N.D. Ill. 2001) (applying *Adlman*, 134 F.3d at 1202).  Routing such an audit through an attorney does not confer work product privilege on the audit records where, as here, there is no suggestion that the records contain attorneys' mental impressions or litigation strategies – material at the heart of the work product doctrine. *See* FRCP 26(b)(3)(B); *Adlman*, 134 F.3d at 1200.  As the district court in Illinois recognized, "[t]hose strategies may be shaped by such a report, but that is true of all information available to attorneys and accessible through discovery."  *Harston*, 2001 WL 817855, *2.  GenOn has pointed to nothing that is protected by FRCP 26(b)(3).

Stone & Webster also moves to disqualify FTI as an expert on the grounds that Stone & Webster shared a prior confidential relationship with FTI and provided it with confidential documents.  However, it misconstrues the relevant test for expert disqualification, and alleges that confidential information was provided within a confidential relationship created by the agreement executed by FTI and Stone & Webster on September 30, 2010.  Even if this is the proper relationship to focus on – as opposed to a relationship prior to the one out of which disclosures were made – it is difficult to see how any expectation of confidentiality could have been reasonable.  Here, FTI was retained not by Stone & Webster – the party seeking disqualification – but by its counterparty.  This fails to satisfy the basic test for expert disqualification, which requires an affirmative answer to the questions (1) was it objectively reasonable for the first party who claims to have retained the expert to conclude that a confidential relationship existed; and (2) was any confidential or privileged information disclosed by the first party to the expert?  *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer Inc.*, No. 95-CV-8833 (RPP), 2000 WL 42202, *4 (S.D.N.Y. 2000).  Moreover, Stone & Webster has not shown how any information it provided is confidential or privileged.  To the contrary, it was contractually obligated to disclose the information that it provided to FTI.

Stone & Webster's motion to disqualify counsel falls similarly short.  With rare exceptions, disqualification is limited to situations that involve conflicts of interest or an attorney's potential to use, against an opposing party, information gained through a prior representation of the opposing party.  *See Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1249 (1979).

Neither situation obtains here, and Stone & Webster fails to show that disqualification is otherwise warranted. I have considered the parties' remaining arguments and find them unavailing.

### IV. Conclusion

For the foregoing reasons, Stone & Webster will proceed in accordance with this discussion and the relevant scheduling orders; GenOn's motion to quash or for a protective order is DENIED; Stone & Webster's motion to compel is GRANTED; and Stone & Webster's motion to disqualify is DENIED. The parties are directed to appear for a status conference on June 28, 2011 at 4:30 P.M. to ensure that discovery is proceeding in a manner consistent with the Order and this Opinion.

The Clerk of the Court is directed to close the relevant motions (docket numbers 22, 28, and 36) and remove them from my docket.

**IT IS SO ORDERED.**

**New York, New York**

**June 6, 2011**

**Hon. Harold Baer, Jr.**

**U.S.D.J.**

6