UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

GENON MID-ATLANTIC, LLC and GENON CHALK
POINT, LLC,

                Plaintiffs,

          -against-                            Case No. 11 CIV 1299 (HB/FM)

STONE & WEBSTER, INC.,

                Defendant/Third-Party Plaintiff

          -against-

SIEMENS WATER TECHNOLOGIES CORP.,

                Third-Party Defendant
------------------------------------------------------------------x


---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT STONE & WEBSTER, INC.'S MOTION FOR SANCTIONS BASED ON PLAINTIFFS' SPOLIATION OF EVIDENCE

---

                                 PECKAR & ABRAMSON, P.C.
                                 *Attorneys for Defendant & Third-Party Plaintiff*
                                 *Stone & Webster, Inc.*
                                 41 Madison Avenue, 20th Floor
                                 New York, New York 10010
                                 (212) 382-0909

Of Counsel:
Bruce D. Meller
Michael A. Branca
Paul G. Monte

## PRELIMINARY STATEMENT

This memorandum is respectfully submitted on behalf of defendant and third-party plaintiff, Stone & Webster, Inc. ("Shaw"), in support of its motion for appropriate sanctions against plaintiffs, GenOn Mid-Atlantic, LLC and GenOn Chalk Point, LLC ("GenOn"), for their agent's spoliation of evidence.

As detailed in the accompanying Declaration of Michael Branca ("Branca Decl."), including the exhibits thereto, electronic records requested in Shaw's subpoena (the "Subpoena") to GenOn's litigation consultant and expert witness, FTI Consulting, Inc. ("FTI"), which FTI was required to produce pursuant to this Court's June 6, 2011 Order, were destroyed either by gross neglect or intent. This was admitted by Joseph Slavis, the lead consultant from FTI. *See* Branca Decl.

Although FTI produced some e-mails, it did not produce a single e-mail for the six month period between September 24, 2009 (the date FTI was hired by GenOn's attorneys, Alston & Bird ("A&B")) and March 2, 2010. Other gaps in FTI's e-mail production exist between June 24, 2010 and July 23, 2010; August 6, 2010 and October 4, 2010; December 6, 2010 and February 4, 2011; and March 7, 2011 and May 3, 2011. *See* Exhibit D to the Branca Decl.

GenOn had an obligation to require the preservation of these important documents. There also can be no serious dispute that the e-mails that were destroyed could have been preserved had GenOn or FTI, or counsel for GenOn taken affirmative steps to preserve such records. By reason of their collective failure or refusal to act, Shaw is deprived of important, if not crucial, information.

Given the critical nature of the contract audit that GenOn commissioned, and its supposed justification for this action, spoliation of this type and magnitude warrants severe sanctions. The

dismissal of GenOn's complaint would be justified. Alternatively, FTI should be precluded from serving as GenOn's expert on the issue of damages and accounting issues, which are the subject matter of Mr. Slavis's work. Alternatively, in deciding Shaw's accompanying motion for summary judgment or in any subsequent trial, an adverse inference should be taken.

In the event this Court has any doubt that spoliation has occurred, it can and should order a forensic analysis of FTI's computer hard drives, at GenOn and FTI's sole cost and expense. Shaw should not be deprived of evidence that may prove the hollowness of GenOn's allegations in this action.

## FACTS AND PROCEEDINGS TO DATE

The relevant facts to this motion are contained in the accompanying Declaration of Michael Branca, dated December 22, 2011, the exhibits thereto, the accompanying motion of summary judgment and statements in support thereof, and in prior proceedings and orders herein, to which the Court is respectfully referred.

On or about July 30, 2007, Shaw entered into a written agreement with GenOn (the "EPC Agreement") to provide all aspects of the engineering and construction of certain flue gas desulfurization ("FGD") systems at three power generating facilities owned by GenOn.[1] Shaw timely delivered the FGD systems in December 2009, and GenOn publicly announced the success of the Project.[2]

GenOn subsequently exercised its audit rights pursuant to the EPC Agreement, and selected FTI to perform the audit.[3] To assuage concerns about FTI's involvement, FTI (at GenOn's behest) entered into a Confidentiality Agreement with Shaw, wherein FTI and GenOn

---

[1] *See* ¶ 3 of Declaration of Peter Ferguson, dated May 3, 2011 ("Ferguson Decl."). The Ferguson Decl. was filed in support of Shaw's cross-motion to compel production of the Subpoenaed documents. It is located in the case record at Document 27-2, and the cited text is found at page 1-2 of 71.
[2] *See* Ferguson Decl. ¶ 4, located at Record document 27-2, page 2 of 71.
[3] *See* Ferguson Decl. ¶ 5, 8, located at Record document 27-2, pages 2-3 of 71.

represented that FTI was retained by GenOn, and that the information derived would be shared only with GenOn and members of FTI's engagement team (which was defined as including only FTI employees).[4] The Confidentiality Agreement, which bears the date September 30, 2010, was signed by Joseph Slavis as Managing Director of FTI.[5] The Confidentiality Agreement did not state, and GenOn and FTI never revealed to Shaw that FTI had been hired by A&B, that A&B was directing FTI's activities, or that FTI's activities were undertaken in anticipation of or preparation for litigation.[6]

On April 11, 2011, Shaw served a Subpoena upon FTI. *See* Branca Decl., Exhibit C. The Subpoena requested that FTI produce all e-mails sent or received by FTI in connection with its audit of Shaw's time and costs for the projects at issue.

On or about April 26, 2011, GenOn filed a motion to quash the Subpoena. In the motion, GenOn, FTI, and A&B claimed that FTI was a litigation consultant whose documents were work product. To avoid producing FTI's documents, they confessed to facts proving that (a) FTI was hired by A&B, not GenOn[7]; (b) FTI was secretly gathering information for use against Shaw in litigation, at the same time it purported to be performing only a contract audit function; (c) FTI entered into the Confidentiality Agreement with every intention of violating its terms; and (d) FTI did violate its terms by sharing confidential information with A&B. Shaw has also learned that GenOn anticipated litigation with Shaw since January 2009, and A&B was hired by GenOn in February 2009 in anticipation of litigation (*see* the Order of Magistrate Frank Maas, dated November 12, 2011, at page 12).

---

[4] *See* Ferguson Decl. ¶ 9, located at Record document 27-2, page 3 of 71.
[5] *See* Ferguson Decl. ¶ 10, located at Record document 27-2, page 4 of 71.
[6] *See* Ferguson Decl. ¶ 12, located at Record document 27-2, page 5 of 71.
[7] In contradiction of all prior correspondence and representations.

Shaw cross-moved to compel the production of FTI's documents responsive to the Subpoena. By Order dated June 6, 2011, this Court granted Shaw's cross-motion, in part, and directed that FTI produce documents responsive to the Subpoena.

FTI failed to produce all documents requested in the Subpoena as required under the Order because they were never saved. *See* Branca Decl., including ¶¶ 11 and 12 and Ex. D thereto. Although FTI was hired on September 24, 2009 (Order, p. 3), FTI did not produce a single e-mail that was sent or received by it between September 24, 2009 and March 2, 2010. FTI also failed to produce any e-mails that it sent or received between: June 24, 2010 through July 23, 2010 (one month); August 6, 2010 through October 4, 2010 (two months); December 6, 2010 through February 4, 2011 (two months); and March 7, 2011 through May 3, 2011 (two months). *See* Branca Decl., ¶¶ 11 and 12 and Ex. D thereto.

FTI's Managing Director Joseph Slavis was deposed on October 14, 2011. *See* Branca Decl. ¶ 13 and the complete transcript attached thereto as Ex. E ("Slavis Tr."). In a prior Affidavit to this Court, Mr. Slavis had represented that "[s]ince the date of FTI's engagement … [he] had overall day-to-day responsibility for FTI's services…"[8] This representation comports with FTI's retention letter, which states:

> Joe Slavis will participate as Managing Director, maintaining overall day-to-day engagement responsibility for the Engagement, including billing and engagement administration. Mr. Slavis will be actively involved in the performance of the Engagement and will use such other staff for assistance as deemed necessary.[9]

During his deposition, Mr. Slavis admitted that while FTI was performing its audit function it was also secretly gathering information for GenOn's counsel's use against Shaw in

---

[8] *See* Affidavit of Joseph Slavis, dated April 25, 2011 ("Slavis Aff."), ¶ 5. The Slavis Aff. was filed by GenOn in support of its motion to quash the Subpoena. It is located in the case record at Document 24-1 and the cited text is found at page 3 of 4.

[9] *See* Retainer Agreement, p. 2, a copy of which is annexed to the Slavis Aff. as Ex. 1. It is located in the case record at Document 24-2, page 3 of 7.

litigation.  *See* Slavis Tr. at 12:4-9.  He confirmed that FTI communicated using e-mails, and that he did not have all of the e-mails during the time period of his audit work.  *See* Slavis Tr. 17:13-18:17; 19:3-25.  *See* Branca Decl., Ex. E.

When asked whether e-mails were destroyed, Mr. Slavis responded "possibly."  *See* Slavis Tr. 19:13-15.  He did not recall receiving instruction from A&B or GenOn.  *See* Slavis Tr. 22:15-19.  Also, despite the fact that FTI markets itself as experienced in the field of litigation consulting (*see* Branca Decl., Ex. F), FTI made no effort to preserve its e-mails prior to FTI's receipt of this Court's June 6, 2011 Order.  *See* Slavis Tr. 18:25-19:23.  In fact, Mr. Slavis states that e-mails were destroyed as part of a periodic cleaning of his e-mail box and relevant e-mails and attendant documents may have been destroyed.  *See* Slavis Tr. 19:3-6; 22:20-23:5.

GenOn identified FTI as their expert witness and produced expert reports, not from Joseph Slavis but from Patrick A. McGeehin, Matthew Krafft and Neil Gaudion who are also representatives of FTI.  *See* Branca Decl., ¶ 18.

## ARGUMENT

## POINT I

## GENON SHOULD BE SANCTIONED
## FOR SPOLIATION OF EVIDENCE

Spoliation is defined as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *See West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2nd Cir. 1999); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 215 (S.D.N.Y. 2003).

> It has long been the rule that spoliators should not be able to benefit from their wrongdoing.  This policy is captured in the

> maxim *omnia presumuntur contra spoliatorum*, which means, 'all
> things are presumed against a despoiler or wrongdoer.' *Black's
> Law Dictionary*, 1086 (6th ed. 1997)
>
> Recognizing acts of spoliation and punishing the spoliators is the
> result of judicial recognition that the 'spoliated physical evidence'
> is often the best evidence as to what has really occurred and that
> there is an inherent unfairness in allowing a party to destroy
> evidence and then to benefit from that conduct [citation omitted].

*See Trigon Ins. Co. v. U.S.,* 204 F.R.D. 277, 284 (E.D.Va. 2001).

Sanctions are imposed for spoliation of evidence, pursuant to the Court's inherent power

to control litigation. *See West v. Goodyear Tire & Rubber Co.,* 167 F.3d at 779. This inherent

power is founded upon the "need to preserve the integrity of the judicial process in order to

retain confidence that the process works to uncover the truth…" *See Pension Comm. of Univ. of

Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d at 466.

Spoliation sanctions are founded upon the well-established, common law duty to preserve

evidence. *Id.* When that duty is breached and spoliation of evidence occurs, sanctions are

required to "ensure that the judicial process is not abused." *Id.* Determining an appropriate

sanction for spoliation is a matter within the "sound discretion of the trial judge, and is assessed

on a case-by-case basis." *See Zubulake v. UBS Warburg LLC*, 220 F.R.D. at 215.

Here, spoliation sanctions should be imposed on GenOn because FTI failed to preserve

relevant evidence and FTI was and is an agent of GenOn. GenOn cannot rely on FTI to support

its unfounded claims against Shaw and then argue it has no responsibility for FTI's acts or

omissions to act.

FTI was required to preserve and produce all relevant e-mails sent or received by FTI,

and GenOn and its counsel oversaw FTI's work. Yet, FTI failed to produce a single e-mail that

FTI sent or received during the six month period following the date that FTI was hired

(September 24, 2009 through March 2, 2010). Other significant gaps in FTI's e-mails exist, and no e-mails were produced for the following periods: (a) June 24, 2010 through July 23, 2010, (b) August 6, 2010 through October 4, 2010, (c) December 6, 2010 through February 4, 2011, and (d) March 7, 2011 through May 3, 2011. Those time periods account for one full year of e-mail correspondence that has not been produced by FTI.

Although he clamed he e-mailed infrequently, Mr. Slavis admitted that he communicated by e-mail with A&B, GenOn, and other FTI employees. *See* Slavis Tr. 17:13-18:7. He acknowledged, however, that some of these e-mails were likely to have been lost or destroyed. *See* Slavis Tr. 19:13-25. It would be appropriate for this Court to conclude that GenOn and FTI either intentionally orchestrated their destruction to keep them from Shaw or failed in their legal obligation to preserve them.

During his deposition, Mr. Slavis was asked the following questions and provided the following responses:

Q. Did you maintain the e-mails that you sent?

A. I mean, I believe my e-mail box gets cleared out periodically as a matter of function, but I didn't do anything specifically to keep my e-mails until an order was issued.

Q. So, in September of 2009, you knew that you had been engaged as a litigation consultant, yet you took no steps to maintain your e-mail files; is that correct?

MS. KLEIN: Objection to form.

A. Possibly.

*See* Slavis Tr. 18:25-19:15.

\*      \*      \*

Q. As part of the contract audit that you performed, were you requested or directed by Alston & Bird to maintain your electronic mail?

A.      No.

Q.      Sitting here today, do you know if any electronic mail that you or your colleagues had sent or received relating to the contract audit has been destroyed?

A.      I don't know.

Q.      But [you] took no steps to ensure that your electronic mail related to the contract audit was maintained, correct?

MS KLEIN:    Objection to form.

THE WITNESS:       Correct.

*See* Slavis Tr. 22:15-23:5.

FTI clearly made no effort to preserve e-mails that were being transmitted during the course of the contract audit that was the impetus for GenOn's complaint for declaratory judgment. If e-mail boxes are cleaned out periodically, that means the e-mails are destroyed. The loss of data due to unfamiliarity with record-keeping policy, and the failure to preserve relevant electronic data has been found to constitute gross negligence. *See, Pastorello v. City of New York*, 95 Civ. 470, 2003 WL 174606 (SDNY Apr. 1, 2003) and *In re NTL, Inc. Sec. Litig.*, 244 FRD 179, 198-99 (SDNY 2007).

A.      FTI Is a Litigation Consultant
        Without A Known Document Retention Policy

Mr. Slavis testified that he is unaware whether or not FTI has a document retention policy. *See* Slavis Tr. 18:10-15. That testimony is suspect.

FTI is in the business of litigation consulting. *See* Branca Decl. Ex. H. FTI markets itself as having a unique experience and expertise in this area. According to its website:

> FTI has an …experienced global team [that] provides valuable insight and clarity, helping clients during ever every stage of a contested matter, from early case assessment and discovery to case strategy.

*     *     *

> We can assist in all phases of judicial….disputes from early case assessment and pre-trial discovery through trial and appeal.

*     *     *

> FTI Consulting provides access to a prestigious team with both in-the-field and in-the-courtroom experience…

*See* Branca Decl. Ex. H.

Preparing a case for litigation and trial is the business in which FTI operates. It must, by virtue of its business, be well acquainted with the rules of discovery, and its document retention obligations. It must have known that its e-mails were relevant and discoverable in the future. It must have a document retention policy; a policy that would have prevented the destruction of these e-mails.

For whatever reason FTI may not have a retention policy, Mr. Slavis's testimony demonstrates that the destruction of FTI's e-mails was either intentional or grossly negligent. Perhaps FTI was more interested in pleasing an important and well paying client.

FTI was able to and did produce e-mails beginning in March 2, 2010. Thus, there was no routine destruction of e-mails during the fifteen month period between March 2, 2010 (the first e-mail produced) and June 6, 2011 (the date when FTI allegedly began preserving e-mails). The large gaps that exist in FTI's e-mail production cannot be accounted for by the routine purging of FTI's e-mail system. The gaps would seem to exist only because FTI intentionally cherry-picked and selected certain groups of e-mails for destruction or withholding from production.

That gap should be enough for this Court to conclude that the documents that were destroyed are relevant. The content of the missing documents was not recalled by Mr. Slavis, but given the gap and scope of FTI's services their content can be inferred to have been relevant.

B.      GenOn's Litigation Strategy Supports a Conclusion That
        <u>E-mails Were Intentionally Destroyed to Keep Them From Shaw</u>

The destruction of FTI's e-mails is only the latest incident in what is an unmistakable pattern of misconduct by GenOn and FTI under A&B's watch.  Their misconduct includes, but is not limited to the following:

a.)     GenOn falsely stated that it hired FTI in furtherance of contractual audit, and did not disclose to Shaw that FTI was hired as secret agent and "litigation consultant" to A&B for the purpose of building a case against SHAW;

b.)     GenOn offered to have FTI sign a Confidentiality Agreement knowing that FTI would misrepresent by whom it was retained, and would later breach the Confidentiality Agreement by disclosing confidential information to A&B in fulfillment of its litigation consultant role;

c.)     FTI entered into the Confidentiality Agreement knowing that the Confidentiality Agreement inaccurately stated that GenOn hired FTI in furtherance of contractual audit rights alone, and did not disclose FTI's role as secret agent and litigation consultant to A&B; and that FTI would later breach the Confidentiality Agreement by disclosing confidential information to A&B in fulfillment of its litigation consultant role;

d.)     FTI breached the Confidentiality Agreement by disclosing confidential information to A&B;

e.)     A&B, through its "secret agent" FTI, engaged in numerous direct communications with Shaw, over an extensive period of time, knowing that Shaw is represented by legal counsel; and

f.)     After having tricked Shaw into engaging in an open dialogue with FTI, and providing comprehensive audit materials to FTI, GenOn and FTI sought, by means of a meritless motion to quash Shaw's Subpoena to FTI, to deny Shaw access to the very audit results that GenOn used as grounds to deny payment to Shaw for the work that it satisfactorily performed.

FTI's failure to preserve and produce all of its e-mails is only the latest in a series of misconducts.  Given GenOn's and FTI's prior misconducts, and the unbelievable testimony of Joseph Slavis, this Court can rightfully conclude that FTI intentionally destroyed or withheld e-mails from its production, at the behest of GenOn, and as part of its litigation strategy.

Another part of GenOn's litigation strategy concerns expert designations. Given that Mr. Slavis had been caught in numerous misrepresentations and would have been subject to damaging credibility challenges, GenOn has replaced Mr. Slavis. It now offers Patrick A. McGeehin, Matthew Krafft and Neil Gaudion as its designated experts. By this substitution, GenOn seeks to hide the stain of misconduct that surrounds Mr. Slavis and start fresh with new witnesses who have fewer obvious credibility flaws.

The destruction of FTI's e-mails has prejudiced Shaw in the preparation of its claims and defenses. Notable is Mr. Slavis's testimony that despite the audit function he was asked to perform, he did not put his conclusions in writing. *See* Slavis Tr. 64:24-65:25. It is apparent that GenOn, through its counsel at A&B, were trying to tailor the information that would later be available to Shaw.

Although it was FTI that destroyed evidence, GenOn should be held responsible for that spoliation. FTI was and is GenOn's agent. GenOn rightfully can be held responsible for FTI's acts or omissions to act. In this case, given the repeated misdeeds of GenOn related to FTI, the appropriate sanction is a dismissal of GenOn's Amended Complaint.

Alternatively, if the Court is unwilling to dismiss GenOn's Amended Complaint, FTI should be precluded from serving as GenOn's expert, at least insofar as damages and accounting issues are concerned, since FTI's expert report is a by-product of GenOn's misconduct; or the Court should draw an adverse interest when deciding the accompanying motion for summary judgment or at any trial.

If there is any doubt, the Court should order a forensic analysis of FTI's hard drives, at the sole cost and expense of GenOn and FTI.

## Duty to Preserve

Generally speaking, an innocent party must establish three elements in connection with a spoliation claim; that the spoliator (1) had control over the evidence and an obligation to preserve it at the time of destruction or loss; (2) acted with a culpable state of mind upon destroying or losing the evidence; and that (3) the missing evidence is relevant to the innocent party's claim or defense. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d at 467.

> It is well established that the duty to preserve evidence arises when a party reasonably anticipates litigation. 'Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents.'

*Id.* at 466; *Zubulake v. UBS Warburg LLC*, 220 F.R.D. at 218. The duty to preserve evidence includes expert materials. *See Trigon Insurance Co. v. U.S.* 204 F.R.D. at 288. It also extends to the period before litigation, to when a party reasonably should know that the evidence may be relevant to anticipated litigation. *See Kronisch v. U.S.*, 150 F.3d 112, 126 (2d Cir. 1998); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d at 466 ("[a] plaintiff's duty is more often triggered before litigation commences, in large part because plaintiff's control the timing of the litigation.")[10]

The duty to preserve evidence begins with the party's counsel who is required to advise his or her client as to the types of potentially relevant information and the need to prevent its destruction. *See Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 73 (S.D.N.Y. 1991). The use of litigation holds has become an integral part of litigation practice. The failure to

---

[10] Where, as here, the duty concerns electronic records, the obligation to preserve arises when "the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *See Zubulake v. UBS Warburg LLC*, 220 F.R.D. at 216.

implement a "litigation hold" at the outset constitutes gross negligence. *See Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec.*, 685 F. Supp.2d at 465.

Here, GenOn's duty to preserve FTI's e-mails arose long before this litigation was commenced. According to this Court's November 10, 2011, Order, GenOn "first anticipated litigation with [Shaw] in January 2009" based upon the loss of float time and the potential that the State of Maryland would impose fines upon GenOn. One month later, in February 2009, GenOn hired A&B to serve as its attorneys "in connection with 'potential litigation' against [Shaw]" *Id.* Thus, GenOn anticipated litigation and was under a duty to preserve documents since January 2009.

A&B hired FTI on September 24, 2009, long after GenOn first anticipated litigation with Shaw. Accordingly, GenOn was responsible for seeing to it that FTI preserved all relevant evidence, including any and all e-mails sent or received by FTI since it was hired. Despite that, GenOn and FTI failed to take even the most basic precautions necessary to preserve this potentially critical e-mail evidence.[11]

### Relevance of the E-mails and Prejudice to Shaw

FTI's e-mails are, not only relevant, but critical to an assessment of the claims and defenses being asserted in this litigation. The destruction of this evidence severely prejudices Shaw, both in proving its affirmative claims and in defending itself against GenOn's claims.

The e-mails were a contemporaneous record of the contract audit function performed by FTI, made at a time when the specter of litigation was more distant and FTI presumably was searching for support of GenOn's claims. Had they not been destroyed, the e-mails would have revealed the inner workings, thoughts, and conversations had by FTI while performing the audit.

---

[11]  GenOn did not even issue a litigation hold letter until May 2011, nearly two years after it first anticipated litigation.

They are likely to have been more objective and forthright than the well-manicured testimony and positions FTI and GenOn took in expert reports and will take at trial. They would have been invaluable in assessing the opinions of FTI, which opinions are the basis for GenOn's refusal to pay Shaw.

In *Trigon v. U.S., supra*, a corporate taxpayer commenced litigation against the United States government demanding a refund of federal income taxes and assessed interest. The government hired a litigation consultant to assist it in the preparation of its case, and Trigon requested the production of the litigation consultant's documents. Although draft expert reports between the litigation consultant and a third party were requested, the government was unable to produce them because they had been destroyed as a result of the consultant's document retention policy. The court held that the government had a duty to preserve the litigation consultant's correspondence, including draft expert reports. *Id.* at 287. The fact that the documents were destroyed pursuant to the consultant's document retention policy did not excuse the government's breach of that duty, or preclude a finding that the documents were intentionally destroyed. *Id.* at 289. That the documents were destroyed by a "litigation consultant" was considered all the more egregious since a litigation consultant is "charged with knowing that materials reviewed … must be preserved and eventually produced to the opposing party. The document retention policies of [the litigation consultant] do not trump the Federal Rules of Civil Procedure …" *Id.* Thus, the court held that the documents were willfully and intentionally destroyed. *Id.*

In determining the appropriate remedy, the court reasoned that:

> The ability meaningfully to cross-examine experts is important because their reliability is essential to the adversary system. With the increasing demand for expert testimony by litigants, an astounding number of 'expert consultants' has arrived on the

scene. Some of these 'experts' are of dubious assistance to the trier of fact… Because experts are often less then helpful and sometimes misleading, effective cross-examination by an opposing party is an essential tool for exposing any weaknesses in the expert's opinions. One such potential weakness is the source of information the expert has considered (whether accepted or rejected) in forming his opinions. It can be important for the trier of fact to know whether the expert's opinion was arrived at after an independent review of all relevant facts or whether the opinion was formed in reliance on 'facts' chosen and presented by an attorney advocating a particular position or by a litigation consultant. Of course, that information can surface on cross-examination only if an opposing party has been able to discover the material provided to the expert by the lawyer or consultant.

*See Trigon Ins. Co. v. U.S.,* 204 F.R.D. at 289-90. The destruction of the litigation consultant's materials was viewed as "most serious indeed." *Id.* at 290. The destroyed documents were "invaluable" since they could have been used to test the expert's credibility, the validity of its opinions, and the evolution of its theories. *Id.*

Here, the lost or destroyed e-mails were equally invaluable and would have served the same purposes had they not been destroyed. As in *Trigon*, the destruction of these materials was intentional whether this Court determines that FTI specifically and intentionally culled these documents from its production for the purpose of destroying or withholding them from Shaw, or that the documents were destroyed as a result FTI's purge of its e-mails. Shaw has suffered prejudice in the form of a diminished ability to cross-examine FTI about the substantive validity of its opinions, the way the opinions were arrived at, and whether their analysis was truly independent or spoon-fed to them by their paying client.

GenOn and FTI have, by act or omission, seen to it that this potentially critical evidence will never be viewed by the trier of fact. That these e-mails may have completely contradicted GenOn's claims in this litigation must be considered in determining whether and to what extent GenOn should be sanctioned. Given the critical nature of FTI's function in establishing or

rebutting GenOn's claims in this litigation, it is beyond question that these e-mails are relevant

and that their destruction has significantly prejudiced Shaw.

> Relevance and prejudice may be presumed when the spoliating party acted in bad faith or in a grossly negligent manner. 'Where a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party.'

*See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.,* 685 F. Supp. 2d at

468.

## Culpability of GenOn and FTI

In considering what the appropriate sanction should be for spoliation of evidence, courts

have looked at the spoliating party's level of culpability. In others words, was the party's

conduct acceptable, or was it negligent, grossly negligent, or willful?

> …these terms simply describe a continuum [citation omitted] Conduct is either acceptable or unacceptable. Once it is unacceptable, the only question is how bad is the conduct. That is a judgment call that must be made by a court reviewing the conduct through the backward lens known as hindsight. It is also a call that cannot be measured with exactitude and might be called differently by a different judge.

*Id.* at 463.

In Pension Committee, the Court defined negligence as conduct:

> which falls below the standard established by law for the protection of others against unreasonable risk of harm. It is caused by 'heedlessness or inadvertence,' by which the negligent party is unaware of the results which may follow from [its] act.

*Id.* at 464. "A failure to preserve evidence resulting in the loss or destruction of relevant

information is surely negligent, and, depending upon the circumstances, may be grossly

negligent or willful." *Id.* Here, GenOn was responsible for the preservation of FTI's e-mails.

16

However, FTI, the experienced litigation consultant, intentionally destroyed the e-mails or failed to preserve them resulting in their loss or destruction. This conduct, for which GenOn is responsible, was more egregious than mere "heedlessness or inadvertence," and GenOn and FTI must have been aware of the consequences that would result from their failure to take steps to preserve relevant evidence. GenOn was more than merely negligent. It was either grossly negligent or willful.

Gross negligence has been defined by as "..a failure to exercise even that care which a careless person would use [citation omitted]." *Id.* at 464.

Willfulness has been defined as requiring "that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow." *Id.* at 464. For example, "the intentional destruction of relevant records, either paper or electronic, after the duty to preserve has attached, is willful." *Id.*

FTI's e-mails were destroyed long after GenOn and FTI's duty to preserve those e-mails attached. The gaps in FTI's production of e-mails, along with the unbelievable testimony given by Joseph Slavis concerning FTI's lack of a document retention policy and the supposed routine destruction of FTI's e-mails, leads to only one conclusion – that FTI's e-mails have been intentionally destroyed or withheld from production.

## Remedies

The appropriate sanction for spoliation "is confined to the sound discretion of the of the trial judge and is assessed on a case by case basis." *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d at 469. In determining the appropriate sanction, the Court must take into consideration the "prophylactic, punitive and remedial

rationales underlying the spoliation doctrine" *See West v. Goodyear Tire and Rubber Co.,* 167 F.3d 776, 779 (2nd Cir. 1999); *Kronisch v. U.S.*, 150 F.3d at 126 (the sanction must place the innocent party in as good of a position as if the spoliation had not taken place). Specifically, the sanction should:

> (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'

*See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.,* 685 F. Supp. 2d at 469. Appropriate sanctions include, but may not be limited to "further discovery, cost-shifting, fines, special jury instructions [including adverse inference], preclusion, and the entry of default judgment or dismissal (terminating sanctions)." *Id.*

(a)     Striking of Pleadings

Although dismissal of a party's claims is an extreme remedy, the courts have not hesitated to do so where a party has intentionally destroyed evidence. *See, e.g.*, this Court's decision in *Arista Records v. Usenet*, 633 F. Supp. 2d 124, (S.D.N.Y. June 30, 2009).

In *Gutman v. Klein*, 2008 WL 4682208, *1 (E.D.N.Y. October 15, 2008), the plaintiff discovered that the defendant had spoliated evidence on his computer. The defendant deleted numerous files, most of which were not recoverable, and made other attempts to prevent the discovery of computer evidence. *Id.* at 3-5. The court concluded that the evidence was relevant, that the defendant spoliated the evidence after he knew that litigation had commenced, and that he did so with a culpable state of mind. *Id.* at 7-8. The court further noted that this destruction of computer evidence was among the "most serious forms of spoliation" and merits the "harshest

18

sanctions." *Id.* at 12.  In refusing to impose the lesser sanction of an adverse inference, the court

further reasoned that

> lesser sanctions such as adverse inferences are ill-suited to a case
> like this, where the spoliator has, in bad faith, irretrievably deleted
> computer files that likely contained important discovery
> information.

*Id.* at 12.

Here, as in *Gutman*, this Court should conclude that FTI's e-mails were intentionally and

willfully destroyed.  Since FTI's audit function, the information it gathered, and the conclusions

it drew from that information are central to a determination of the issues in this litigation, it is

impossible to correct the damage that the destruction of this evidence will have on Shaw's case.

Furthermore, since FTI's entire investigation into the books and records of Shaw is replete with

misconduct and deception, the most severe sanction is appropriate.   GenOn's Amended

Complaint should be dismissed.

(b)      Preclusion

Alternatively, the Court should preclude FTI from testifying at trial.  Representatives of

FTI should not be permitted to take the stand and testify to the events in this litigation after it

allowed, if not caused, the destruction of contemporaneous records that could have been used to

impeach the testimony of its representatives.  There can be no disputing that Shaw's ability to

cross-examine FTI on the subject of their audit function has been crucially and critically

compromised.

(c)      Adverse Inference

At a minimum, the lesser sanction of an adverse inference is warranted.

An adverse inference instruction can take many forms.  *See Pension Comm. of Univ. of*

*Montreal Pension Plan v. Banc of Am. Sec.,* 685 F. Supp. 2d at 470.  "The harshness of the

instruction should be determined based on the nature of the spoliating party's conduct – the more egregious the conduct, the more harsh the instruction." *Id.*

> In its most harsh form, when a spoliating party has acted willfully or in bad faith, a jury can be instructed that certain facts are deemed admitted and must be accepted as true [citations omitted]. At the next level, when a spoliating party has acted willfully or recklessly, a court may impose a mandatory presumption [citations omitted]…The least harsh instruction *permits* (but does not require) a jury to *presume* that the lost evidence is both relevant and favorable to the innocent party

*Id.*; *see also Kronish v. U.S.,* 150 F.3d at 126. (The destruction of evidence relevant "to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction.")

GenOn and FTI's willful destruction of FTI's e-mails requires, at a minimum, an adverse inference by this Court when deciding the accompanying motion for summary judgment, or later charging the jury. An adverse inference may be drawn against (a) the substance of FTI's expert testimony (by deposition or at trial), (b) the statements in its expert reports, and (c) FTI's credibility in general. *See Trigon Ins. Co. v. U.S.,* 204 F.R.D. at 291 (holding that an adverse inference was appropriate as to the substance of the expert's opinion, and credibility in general, where relevant evidence was spoliated).

(d)     Monetary Sanctions

> 'Monetary sanctions are appropriate 'to punish the offending party for its actions [and] to deter the litigant's conduct, sending the message that egregious conduct will not be tolerated'  Awarding monetary sanctions 'served the remedial purpose of compensating [the movant] for the reasonable costs it incurred in bringing [a motion for sanctions]'

*See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.,* 685 F. Supp. 2d at 470 (*citing Green (Fine Paintings) v. McClendon*, 262 F.R.D. 284, 291 (S.D.N.Y. 2009)

(awarding monetary sanctions)). Here, an award of attorneys' fees to compensate Shaw for the making of this motion is appropriate, but only in addition to the other remedies previously stated.

In the event this Court has any question as to whether there has been a spoliation of relevant emails, it should order a forensic analysis of FTI's hard drives, at GenOn and FTI's sole cost and expense.

## Conclusion

For the reasons stated herein, defendant Stone & Webster, Inc. respectfully requests that one of the above noted appropriate sanctions be imposed upon plaintiffs for spoliation of evidence, with such other relief as this Court deems just and proper.

Dated: December 22, 2011

PECKAR & ABRAMSON, P.C.
*Attorneys for Defendant & Third-Party Plaintiff Stone & Webster, Inc.*


____/s/ Michael A. Branca_____
Michael A. Branca
41 Madison Avenue, 20th Floor
New York, New York 10010
(212) 382-0909

75706v2

21