UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
GENON MID-ATLANTIC, LLC & GENON :
CHALK POINT, LLC, :
 :
    Plaintiffs, :
 :    11 CV 1299 (HB)
        - against - :
 :    OPINION &
STONE & WEBSTER, INC., :    ORDER
 :
    Defendant and Third Party Plaintiff, :
 :
        - against - :
 :
SIEMENS WATER TECHNOLOGIES :
CORP., :
 :
    Third-Party Defendant. :
 :
-------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

    Before the Court are three motions for partial summary judgment brought by Plaintiffs GenOn Mid-Atlantic, LLC and GenOn Chalk Point, LLC (collectively, "GenOn"), Defendant Stone and Webster, Inc. ("Shaw") and Third-Party Defendant Siemens Water Technologies Corp. ("Siemens"). Also before the Court are GenOn's Motion to Strike the Declaration of Lawrence F. Ranallo ("Ranallo Declaration") proffered by Shaw, Shaw's Motion to Strike Portions of the Declaration of Patrick A. McGeehin ("McGeehin Declaration") proffered by GenOn, and Siemens' Motion to Strike the Declaration of Paul Monte ("Monte Declaration") proffered by Shaw. For the reasons set forth below GenOn's Motion to Strike the Ranallo Declaration is GRANTED, Shaw and Siemens' Motions to Strike are DENIED, GenOn's Motion for Partial Summary Judgment is DENIED in part and GRANTED in part, Shaw's Motion for Partial Summary Judgment is DENIED, and Siemens' Motion for Partial Summary Judgment is GRANTED.

1

## I. BACKGROUND[1]

In July 2006, GenOn undertook the upgrade of the air quality control systems at three of its power plants to comply with a new Maryland environmental law. GenOn 56.1 ¶ 1. GenOn and Shaw entered into the Alliance Agreement in June 2006, whereby "Shaw agreed to develop a firm scope of work, prepare schedules and estimate the cost of the work." *Id.* at ¶ 3. On July 30, 2007, GenOn and Shaw entered into an engineering procurement and construction agreement ("EPC Agreement") based, in part, on the Alliance Agreement. *Id.* at ¶ 4; Shaw Response to GenOn 56.1 ¶ 4. Pursuant to the EPC Agreement, Shaw agreed to design and build four flue gas desulfurization ("FGD") systems ("scrubbers") at the three plants.[2] Shaw MSJ 1. Shaw also undertook the design and installation of a wastewater treatment system ("WWTS") at each plant. Siemens 56.1 ¶ 3. To fulfill this portion of the EPC Agreement, Shaw issued three purchase orders ("Purchase Orders") to Siemens under which Siemens agreed to supply wastewater treatment equipment, ancillary engineering and limited start-up services. Siemens 56.1 ¶ 4.

Compensation under the EPC Agreement was determined by a formula including: (1) the target costs set out in the contract ("Target Costs"); and (2) the total amount of reimbursable costs incurred by the contractor to complete the work, or the actual costs ("Actual Costs"). *GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc.* (*GenOn I*), 11 Civ. 1299, 2011 WL 2207513, at *1 (S.D.N.Y. June 6, 2011). The Target Costs were also subject to modification by "change order."[3] The EPC Agreement established a Target Cost of $957,174,000. GenOn 56.1 ¶ 7. Under the EPC Agreement, if Shaw's Actual Costs exceeded the Target Costs, Shaw's fee for performance of the work was lowered in most cases, and if Shaw's Actual Costs were less than the Target Costs, Shaw's fee for performance of the work was enhanced in most cases. *Id.* at ¶¶ 9, 10; Shaw Response to GenOn 56.1 ¶¶ 9-10.

---

[1] The following facts are materially undisputed unless otherwise noted. Additional review of the background of this case is available in my June 6, 2011 opinion, *GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc.* (*GenOn I*), 11 Civ. 1299, 2011 WL 2207513, at *1-*2 (S.D.N.Y. June 6, 2011), and a recent opinion issued by Magistrate Judge Frank Maas on various privilege claims, *GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc.* (*GenOn II*), No. 11 Civ. 1299, 2011 WL 5439046, at *1-*2 (S.D.N.Y. Nov. 10, 2011).

[2] This technology removes sulfur dioxide from the exhaust of flue gases of fossil fuel power plants. Siemens MSJ 2 n.2.

[3] Change orders are added to or deleted from the original scope of work of a contract, which alter the original contract amount or completion date of the project. A change order could stem from a legitimate, previously unknown obstacle to a project or from a contractor's addition of fees and work items through change orders once they have obtained the contract.

Exhibit 8 to the EPC Agreement included a full estimated price for the project developed by Shaw. GenOn 56.1 ¶ 12. The total estimated price was $1,110,321,000, which included the $957,174,000 Target Cost, Shaw's fees, and a $95,717,000 contingency fund ("Contingency"). GenOn56.1, Ex. 2 Target Price. The Contingency fund was to be used in the event of cost overruns for performance of the work that increased the Actual Cost beyond Shaw's estimate. GenOn 56.1 ¶ 14; Shaw Response to GenOn 56.1 ¶ 14. The EPC Agreement describes the conditions governing Shaw's access to the Contingency. GenOn 56.1 ¶ 15; Shaw Response to GenOn 56.1 ¶ 15.

## II. MOTIONS TO STRIKE

### A. Legal Standard for Motion to Strike

"An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The personal knowledge requirement is relaxed for experts who "may base an opinion on facts or data in the case that the expert has been made aware of or personally observed" provided that other experts in the field would "reasonably rely" on similar information. Fed. R. Civ. P. 703; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993) (explaining that an expert is "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation"). Courts also allow attorneys to submit declarations in support of a motion for summary judgment as a vehicle to introduce evidence produced in discovery into the record in a cohesive manner. *See, e.g.*, *Degelman Indus. Ltd. v. Pro-Tech Welding & Fabrication, Inc.*, No. 06-CV-6346T, 2011 WL 6752565, at *3 (W.D.N.Y. Dec. 23, 2011).

### B. Shaw's Motion to Strike Portions of the Declaration of Patrick A. McGeehin

GenOn relies on the McGeehin Declaration in support of its motion for partial summary judgment. McGeehin is the Senior Managing Director at FTI Consulting, Inc. ("FTI"), a consulting group hired by GenOn to serve as accountants pursuant to the EPC Agreement. Shaw first argues that Paragraphs 5, 6 and 10(f)[4] are inadmissible because they are not based on personal knowledge. Paragraphs 5 and 6 describe the efforts of the FTI team, which McGeehin oversaw, to determine Shaw's Actual Costs based on the documents submitted as Shaw's Final Accounting and are in essence allowable information that present the tasks performed by McGeehin's team at FTI. Shaw also asserts that McGeehin's reference to the conclusions of

---

[4] Shaw incorrectly lists paragraph 11(f) as the location of McGeehin's statement regarding "Neil Gaudion."

3

Neil Gaudion, also of FTI, that Shaw had caused some of its own cost increases, "improperly attempts to adopt the personal knowledge of others as his own." Shaw Motion to Strike at 2. Gaudion's conclusions are not offered for the truth of the matter asserted but "provide[] a reason for reviewing Shaw's final accounting," GenOn Opp. 7, and as such are admissible.

Shaw's argument that Paragraphs 8 and 9, which summarize the relevant provisions of the EPC Agreement, are impermissible legal interpretations of Shaw's obligations under the EPC Agreement, is also without merit. *Iacobelli Constr. Inc. v. Cnty of Monroe*, 32 F.3d 19, 25 (2d Cir. 1994) (noting that the experts summarized and analyzed the contract in forming their opinions). Finally, Shaw argues that paragraphs 6 and 10-12 impermissibly present McGeehin's opinion that the information provided by Shaw was insufficient to determine Shaw's Actual Costs. McGeehin, like the experts in *Iacobelli*, has sufficiently identified the facts on which he bases his conclusions. Shaw's Motion to Strike the McGeehin Declaration is denied.

## C. GenOn's Motion to Strike the Declaration of Lawrence F. Ranallo

In its memorandum opposing GenOn's Motion for Partial Summary Judgment, Shaw proffered the Ranallo Declaration to rebut the McGeehin Declaration. GenOn moves to strike the Ranallo Declaration in its entirety, claiming it contains no facts or basis for its stated conclusions.[5] In contrast to the McGeehin Declaration, which explicitly lists the documents McGeehin reviewed and on which he relied, the Ranallo Declaration does not "state the facts upon which the expert allegation is based." *Iacobelli*, 32 F.3d at 25; *see also Mid-State Fertilizer Co. v. Exch. Net. Bank of Chi.*, 877 F.2d 1333 (7th Cir. 1989). Because I find the Ranallo Declaration woefully lacking in support, GenOn's Motion to Strike Ranallo's declaration is granted.[6]

## D. Siemens' Motion to Strike the Declaration of Paul Monte

The Monte Declaration was proffered by Shaw in opposition to Siemens' Motion for Partial Summary Judgment. Siemens asserts that the Declaration should be stricken because it is not based on personal knowledge and contains legal conclusions and argumentative mischaracterizations of the evidence rather than statements of facts.

---

[5] Shaw argues that the motion to strike the Ranallo Declaration was not timely filed because the Court's order required all motions to be filed by February 1, 2012. This is incorrect. The PTSO said that all *dispositive* motions had to be fully briefed by February 1, 2012. This motion to strike is not a dispositive motion.

[6] I need not provide an opportunity to cure because there are genuine issues of material fact in this record even without the Ranallo Declaration. *See* Fed. R. Civ. P. 56(e)(1) (explaining that court may provide "an opportunity to properly support or address the fact").

Because the Monte Declaration introduces evidence into the record for summary judgment, the personal knowledge requirement is not a strong basis to strike the Declaration. *See Degelman Indus. Ltd.*, 2011 WL 6752565, at *3. However, Siemens makes a persuasive argument that portions of the Monte Declaration resemble "an adversarial memorandum [more] than a *bona fide* affidavit." *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999), *abrogated on other grounds by Pacenza v. IBM Corp.*, 363 Fed. Appx. 128 (2d Cir. 2010). As one example, in paragraph 7, the Monte Declaration states that Exhibit D establishes Siemens fault for GenOn's withholding of incentive bonuses to Shaw. Monte Decl. ¶ 7. However, the exhibit provided to establish this fault is inconclusive at best. *See* Monte Decl., Ex. D (noting that the WWTS had problems but not mentioning Siemens or implying that Siemens caused these problems). Rather than strike the Declaration, I will exercise my discretion and disregard the impermissible portions of the Declaration. *See Hollander*, 172 F.3d at 198.

### III. MOTIONS FOR SUMMARY JUDGMENT

#### A. Legal Standard for Summary Judgment

A motion for summary judgment must be granted if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court must resolve all ambiguities and draw all inferences against the moving party. *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005). Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

#### B. GenOn's Motion for Partial Summary Judgment Against Shaw

##### 1. Overview of Causes of Action and Grounds for Partial Summary Judgment

GenOn asserts two causes of action against Shaw in the First Amended Complaint ("Complaint"). In Count I, GenOn seeks a declaration that Shaw is not entitled to recover certain amounts that Shaw claims as actual costs and opines that GenOn is not required to pay such amounts in accordance with Shaw's cost invoices and demands for payment because they were not properly included as actual costs under the EPC Agreement. Am. Compl. ¶ 38. In Count II, GenOn asserts a breach of contract claim, alleging damages from failure to maintain proper records pursuant to the EPC Agreement and also damages that arise from work not designed and built in accordance with the EPC Agreement, among other things. *Id.* at ¶¶ 41, 42.

By its motion for partial summary judgment on Count I, GenOn claims that "(1) Shaw failed to satisfy the express contractual conditions precedent to final payment requested under the Agreement; (2) as a matter of New York law, because Shaw has failed to meet the contractual conditions precedent to payment, Shaw's only remedy is to recover the reasonable costs it incurred in performing work; and (3) based on express waiver, Shaw is precluded from recovering any amounts associated with delays Shaw attributes to GenOn or to differing site conditions that occurred prior to March 24, 2009." GenOn MSJ 1.  GenOn also argues that Shaw is not entitled to the payment of its alleged costs from the Contingency fund because it failed to comply with a provision of the EPC Agreement. According to GenOn, it deserves summary judgment on each issue and if this motion is granted, we can all go home but for a calculation of Shaw's reasonable costs for performing the subject work. *Id.*

### 2. There Are Genuine Issues of Material Fact Regarding Whether Shaw Satisfied the Conditions Precedent to Final Payment

GenOn argues that Shaw failed to satisfy a condition precedent to achieving Final Completion and therefore final payment on the Project because Shaw failed to obtain a certificate from GenOn stating that the requirements for Final Completion were met. *Id.* at 15.  Final Completion cannot be achieved until after GenOn and Shaw complete a Final Reconciliation, which never happened and which required that Shaw "submit to [GenOn] on an Open Book basis a final accounting of all Actual Costs." EPC Agreement § 12.11.2.  According to GenOn, the information submitted by Shaw in support of the Final Reconciliation was merely a collection of spreadsheets that did not enable GenOn to make a determination about whether the costs were necessary, GenOn MSJ 19, or offer any explanation for why the estimate of the cost for the Project was $957,174,000 while the Actual Costs were $1,144,258,922.77.  Shaw responds that the documents it submitted do just that and that GenOn was not entitled to a "qualitative evaluation" of the Actual Costs. Shaw Opp. to GenOn 2.

There are genuine issues of material fact as to whether Shaw has satisfied the conditions precedent to payment, e.g., does the EPC Agreement call for a qualitative evaluation where it seeks a "review" by GenOn's accountants. EPC Agreement § 12.11.2.  The parties each offer plausible interpretations of what "review" might mean. Further, GenOn describes the qualitative review they envision as a determination of "whether Shaw performed its work in compliance with the contractual requirements, whether Shaw's labor hours and third party expenses are 'necessary for proper performance', whether Shaw performed the work using its 'best skill and attention', whether Shaw used persons to perform the work that were 'skilled in tasks assigned to

6

them' or whether Shaw performed the work at the 'lowest reasonable cost consistent with good business practices.' " GenOn MSJ 19 (citations omitted).  The quoted phrases are taken from several different sections of the contract. *See* EPC Agreement § 1.116 (prudent utility practices); EPC Agreement § 10.2 (actual costs section); EPC Agreement § 15 (standards).  Shaw responds that this sort of qualitative analysis by GenOn simply was not envisioned by the parties.  Not surprisingly, both sides offer witnesses who support their own reading of the EPC Agreement. *Compare* McGeehin Decl. ¶ 8 (describing qualitative evaluation including analysis of which hours were "necessary for proper performance," whether the work was performed at the "lowest reasonable cost consistent with good business practices . . . using Shaw's best skill and attention and persons skilled in the tasks assigned to them"), *with* Robert Couse Expert Report 26 ("[T]he approach taken by [GenOn's] experts to withhold compensation to Shaw for the work performed based on an after the fact 'reasonableness' approach is contrary to industry practice, at odds with the contemporaneous actions of both teams and has no basis within the Contract.").

"Ambiguous language is that which suggests 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.' " *E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 174 (2d Cir. 2001) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997)).  It is a question of law whether the written contract is ambiguous. *Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 51 (2d Cir. 2011).  "[T]he meaning of an ambiguous contract is a question of fact for a factfinder." *Scholastic, Inc. v. Harris*, 259 F.3d 73, 82 (2d Cir. 2001) (citing *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000)).  Because both interpretations are plausible and both parties offer competent witnesses to support their reading, I conclude that this portion of the EPC Agreement is ambiguous as a matter of law and a jury must resolve whether this contract requires the qualitative analysis envisioned by GenOn or the quantitative examination contemplated by Shaw.

Second, there is also a genuine issue of material fact as to whether the Final Accounting submitted by Shaw was sufficient to allow GenOn to determine if all of its costs were Actual Costs.  The accountants offer conflicting declarations.  "Where . . . there are conflicting expert reports presented, courts are wary of granting summary judgment." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 79 (2d Cir. 2002); *Gucci*, 2012 WL 456519, at *7 (finding that expert report was insufficient to grant summary judgment and that rebuttal expert's report put conclusions in expert report "directly in dispute"); *Regent Ins. Co. v. Storm King Contracting,*

7

*Inc.*, 06 Civ. 2879, 2008 WL 563465 (Feb. 27, 2008) (denying summary judgment on issue of whether defendant breached contract to install sprinklers where there were "conflicting opinions and statements of the parties' witnesses and experts"); *Rand v. Volvo Fin. N. Am.,* 04 Civ. 00349, 2007 WL 1351751, at *3 (E.D.N.Y. May 8, 2007) ("It is not for the court to decide which expert opinion is more persuasive."). Needless to say, issues of fact abound and summary judgment is denied.

### 3. There Are No Issues of Fact Regarding Whether Shaw is Entitled to Recover Amounts Associated with Delays Attributed to GenOn prior to March 24, 2009

GenOn argues that Shaw's Final Accounting, which was submitted in support of the Final Reconciliation that was to take place between GenOn and Shaw prior to GenOn issuing Shaw a certificate of completion, includes claims settled by the parties when they entered Amendment 2 in March 2009. GenOn MSJ 19. Amendment 2 § 19.18, which increased the Target Cost by $3,645,966, contains a waiver stating, "Contractor expressly and irrevocably waives and releases Owner from any and all Change Order Notices, rights to Change Orders, claims for extensions of the Approved Project Schedule, or claims for increases in the Target Cost or Target Fee, arising out of any Work, acts, omissions, delay, hindrance, interference, extra work, or other events, circumstances or conditions performed, occurring or existing prior to the Effective Date of the Second Amendment . . . ." Shaw does not dispute that under Amendment 2, it waived its right to Change Orders arising prior to the Amendment date of March 2009, but argues that Amendment 2 does not limit its right to Actual Costs.

A plain reading of the EPC Agreement, which was not altered by Amendment 2 "except as expressly modified," Amendment 2 at 11, supports GenOn's view that Change Orders "are Shaw's 'exclusive remedy' for costs incurred due to GenOn's Actions." GenOn MSJ 12. Section 19.7, the section which describes Shaw's right to Change Order in the event that GenOn's actions cause an increase in the cost of the project, explicitly states that "[s]uch Change Order shall be Contractor's sole and exclusive remedy for such increased costs and/or delay." The EPC Agreement is unambiguous. *See Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d. Cir. 2010) ("The the court should not find the contract ambiguous where the interpretation urged by one party would strain [] the contract language beyond its reasonable and ordinary meaning."). Summary judgment in GenOn's favor is appropriate on the issue of Shaw's recovery of amounts associated with delays attributed to GenOn prior to the date of Amendment 2.

### 4. There are Genuine Issues of Material Fact Regarding Whether Shaw is Entitled to Payment of Its Alleged Costs from Contingency

The EPC Agreement provided for a Contingency equal to 10 percent of the Target Cost. GenOn 56.1 ¶ 13. The Contingency was to be used in the event of cost overruns that increased the Actual Costs beyond Shaw's estimate. *Id.* at ¶ 14. Shaw had to obtain GenOn's permission to access more than $1,500,000 of the Contingency per month. *Id.* at ¶¶ 62-64.

There is no genuine issue of material fact as to whether Shaw's payment of Actual Costs was limited by the Contingency provisions. GenOn argues that, "Shaw has no right to payment of its overruns from the Contingency," GenOn MSJ 20, because Section 12.6.2 of the EPC Agreement states that to access the Contingency, Shaw was required to provide specific notices. The clear language of the contract required Shaw to issue Contingency Draw Requests in compliance with Section 12.6.2 (explaining Shaw "shall" submit compliant Contingency Draw Request to access the Contingency).

There is, however, a disputed issue of fact as to whether Shaw complied with Section 12.6.2. *Compare* McGeehin Decl. ¶ 10(b) (explaining that Shaw failed "to identify events, causes conditions, trends, or occurrences causing the overruns, the individual cost items involved, or steps or alternate measures Shaw took, or could have taken, (or which GenOn could have taken) to minimize or avoid the overruns, as required by Section 12.6"), *with* Ferguson Decl. ¶ 33 ("Shaw submitted contingency draw requests in accordance with Article 12.6 of the Contract, starting in March 2008.").

### C. Shaw's Motion for Partial Summary Judgment Against GenOn

#### 1. Overview of Causes of Action and Grounds for Partial Summary Judgment

Shaw asserts several counterclaims against GenOn for breach of contract. The first counterclaim alleges that GenOn breached the EPC Agreement by failing to pay Shaw after Shaw substantially performed under the EPC Agreement. By its motion for partial summary judgment, Shaw seeks (1) summary judgment as to Count I of GenOn's Complaint, (2) judgment as a matter of law that the Actual Costs incurred under the EPC Agreement are $1,144,258,923 as reported in Shaw's Final Accounting, (3) partial summary judgment as to Shaw's First Counterclaim, in the amount of $52,872,463, and (4) summary judgment as to Count II of GenOn's amended complaint with respect to claims for building enclosures that were supposedly missing and for failure to meet certain instrument redundancy specifications.

9

### 2. There are Genuine Issues of Material Fact with Respect to Shaw's Motion Directed to Count I of GenOn's Complaint

Shaw seeks summary judgment as to Count I of GenOn's complaint, which requests a declaration that Shaw was not entitled to recover certain amounts it claimed as Actual Costs. For substantially identical reasons to those outlined in Section III.B.2, there are genuine issues of material fact regarding whether Shaw has satisfied the contractual conditions precedent to payment and so is entitled to the amounts it submitted as Actual Costs in its final accounting.

### 3. There are Genuine Issues of Material Fact Regarding the Actual Costs Incurred

Shaw also seeks judgment as a matter of law that the Actual Costs incurred under the EPC Agreement are $1,144,258, 923 and should be awarded on this motion. Unfortunately, there are genuine issues of material fact as to whether Shaw has proven its Actual Costs so that Shaw's Actual Costs cannot be determined as a matter of law and summary judgment is denied.

### 4. There are Genuine Issues of Material Fact Regarding Shaw's First Counterclaim

Shaw argues that it is entitled to partial summary judgment as to Shaw's First Counterclaim, in the amount of $52,872,464.40. In support of this argument, Shaw argues—in a footnote—that McGeehin used an alternative analysis to conclude that Shaw is owed approximately $1,092,762,162. McGeehin Report 5. Since Shaw has only been paid $1,039,889,697.60, Shaw 56.1 ¶ 58, Shaw argues that it is undisputed that GenOn owes Shaw $52,872,464.40. Nonsense. It is beyond peradventure that McGeehin's report was meant to assist the trier of fact in determining how much Shaw had incurred in Actual Costs, which GenOn believes is necessary because Shaw has failed to submit sufficient information to determine Shaw's Actual Costs. The McGeehin Declaration was not intended as GenOn's concession that Shaw is entitled to a specific amount in excess of what it has been paid, but rather provides evidence of what McGeehin would testify to at trial to aid a jury in determining an Actual Costs figure. Shaw's Motion for Summary Judgment is denied.

### 5. There are Genuine Issues of Material Fact with Respect to Shaw's Motion Directed to Count II of GenOn's Complaint

Finally, Shaw seeks summary judgment as to Count II of GenOn's amended complaint with respect to claims for building enclosures that were supposedly missing and for not meeting certain instrument redundancy specifications pursuant to which GenOn issued backcharges M-005 and M-006 totaling $10.6 million. Shaw MSJ 3. GenOn responds that the parties removed certain items from Shaw's scope of work, but there was no corresponding reduction in the EPC Agreement's Target Cost and Target Fee to reflect the reduced scope of work. Patrick Decl. ¶¶ 5,

6. GenOn initiated the backcharges to make this reduction. *Id.* Shaw responds that Patrick's testimony in his deposition was to the contrary because when asked if it was "GenOn's position that Shaw's original scope of work included the building enclosure [at issue]," Patrick responded "That's not what we asserted in the change order." Patrick Dep. 65-66. Patrick's deposition testimony does not directly contradict his declaration and Shaw will be free to question him about any discrepancy at trial. There are genuine issues of material fact regarding this portion of Count II and summary judgment must be denied.

### D. Siemens' Motion for Partial Summary Judgment Against Shaw

#### 1. Overview of Causes of Action and Basis for Partial Summary Judgment

In its amended third-party complaint ("Third-Party Complaint"), Shaw asserts two claims for breach of contract against Siemens. Count I asserts that "Siemens is contractually bound to hold [Shaw] harmless against GenOn's WWTS Claims, including, without limitation, all costs and reasonable attorney fees." Am. Third-Party Compl. ¶ 16. Count II of Shaw's Third-Party Complaint asserts breach of contract claims against Siemens for supplying inadequate temperature control design and equipment and for additional costs due to the costs of installing temporary temperature control equipment and costs for repairs of miscellaneous Siemens equipment *Id.* at ¶ 22.

Siemens' Motion for Partial Summary Judgment asks that the Court dismiss Count I of Shaw's Third-Party Complaint in its entirety because the contractual indemnity provision does not apply to GenOn's claims against Shaw. Siemens MSJ 1.[7] In the alternative, Siemens asks the Court to dismiss certain damages claims within Count I and Count II.[8] Siemens does not seek summary judgment on Count II (aside from the dismissal of the damage claims), *id.* at 1 n.1 nor does it seek summary judgment on its own counterclaims for breach of contract, costs and attorneys fees, Answer to Third-Party Complaint, alleging that Shaw owes Siemens $3,210,648.83 for the work it completed.

#### 2. There are No Genuine Issues of Material Fact as to Count I in Shaw's Complaint

In its motion for partial summary judgment, Siemens ask that the Court dismiss Count I of Shaw's third-party complaint, which states that "Siemens is contractually bound to hold S&W

---

[7] Siemens memorandum also sought dismissal of the original version of Count II, a claim for common law indemnity; however, as the recently filed First Amended Third-Party Complaint withdraws this claim, that portion of Siemens' motion is now moot.

[8] This is referred to as Count III in Siemens' memorandum, but it is now Count II. Siemens indicates that these arguments apply equally to the damages sought in Count II (previously Count III) in its Reply. Siemens Reply 2.

11

harmless against the WWTS Claims asserted by GenOn in its Complaint." Am. Third-Party Compl. ¶ 16.  In the alternative, Siemens asks the Court to dismiss certain damages claims in Count I.

The indemnity provision that Shaw relies on in asserting its claim against Siemens states that "To the extent of [Siemens'] fault, [Siemens] agrees to protect, indemnify, defend and hold [Shaw], [GenOn] and their respective officers, affiliates and employees free and harmless from and against any and all claims, demands, causes of action, suits or other litigation (including all costs thereof and reasonable attorney's fees) on account *of claims by third parties* for bodily injuries, death or damage to tangible personal property and any other loss or damage which results to the extent of [Siemens' negligence]." Purchase Orders ¶ 25 (emphasis added).

Massachusetts law applies to Shaw's claim for contractual indemnification. Purchase Orders ¶ 21.  Interpretation of an indemnity provision is a question of law to be resolved on a motion for summary judgment. *Petit v. BASF Corp.*, 96-1814A, 2001 Mass. Super. LEXIS 124, at *6 (April 20, 2001).  Under the plain language of the indemnity provision, Siemens did not agree to indemnify Shaw against claims by GenOn because GenOn is not a "third party" but rather is simply another party whom Siemens agreed to indemnify. *See, e.g.*, *Stagg Indus. Devel. Corp. v. GenCorp. Inc.*, No. EV 99-0119-C, 2000 U.S. Dist. LEXIS 15573 (S.D. Ind. May 26, 2000) (finding third-party defendant ILPEA was not required to indemnify GenCorp. in a claim brought by Stagg where ILPEA signed a contract promising to defend GenCorp. and Stagg from any and all claims filed by a third party).  Shaw argues that the phrase "and any other loss or damage" indicates that Siemens is required to indemnify Shaw for loss or damage "irrespective of whether such loss or damage was the result of claims by third-parties." Shaw Opp. 5.  Such a reading would render the term "third parties" superfluous. *See Computer Sys. of Am, Inc. v. Western Reserve Life Assurance Co. of Ohio*, 475 N.E.2d 745, 751 (Mass. App. Ct. 1985 ) ("Every word and phrase of a contract should, if possible, be given meaning, and . . . none should be treated as surplusage if any other construction is rationally possible.").   Summary judgment for Siemens as to Count I of Shaw's Third-Party Complaint is granted.

### 3. There are No Genuine Issues of Material Fact as to the Damages at Issue in Count II of Shaw's Complaint

Siemens also argues that certain of Shaw's claimed damages under Count II are barred by the terms and conditions of the Purchase Orders, or by Shaw and GenOn's admissions.[9]

#### a. Change Orders M-005 and M-006

Siemens seeks partial summary judgment on Shaw's claim for $10.6 million from Siemens in the event that GenOn is successful in asserting its claim against Shaw to deduct change orders M-005 and M-006. Shaw does not dispute that the items at issue in M-005 or M-006 were not within Siemens' scope of work. *See* Shaw Rule 30(b)(6) Dep. 232:5-19 (explaining that as to M-005 "since I'm not aware of the basis that [GenOn] would assert this against us, or the validity of the reasons why they would assert this against us, I am not able to provide you with those reasons either, why we would assert it against you at this time"); *id.* at 217:21-24 (explaining that Shaw did not "believe [M-006] was within Siemens' or Shaw's scope of work"). There is no disputed issue of fact between Shaw and Siemens as to whether the work at issue in change orders M-005 and M-006 was within Siemens' scope of work; both agree that it was not. As a result, partial summary judgment in favor of Siemens is appropriate on this issue.

#### b. Bonuses

Shaw's complaint also claims that Shaw is entitled to indemnification from Siemens for the loss of the contract quality incentive and the performance incentive bonuses, which it failed to earn from GenOn due to deficiencies in Siemens' work. Section 22 of the Purchase Orders explicitly provides that "Neither the Seller or the Purchaser shall be liable to each other . . . for consequential loss or damage, other than those consequential damages resulting from the willful misconduct of Purchaser or Seller." Siemens argues that these bonuses are barred as a plain matter of Massachusetts contract law because the bonuses are consequential damages within the scope of the disclaimer. *See Canal Elec. Co. v. Westinghouse Elec. Corp.*, 548 N.E. 2d 182, 185 (Mass. 1990) (upholding contractual consequential damages disclaimer). The lost bonuses fall within the scope of the disclaimer. *Roneker v. Kenwork Truck Co.*, 977 F. Supp. 237, 240 (W.D.N.Y. 1997) ("Consequential damages do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the non-breaching party in its

---

[9] The parties agreed that Siemens did not have to restate its arguments in its original motion for summary judgment, filed before the Amended Third-Party Complaint that changed the original Count III into Count II. I also need not address the extent to which these arguments are applicable to Count I because summary judgment was granted on Count I.

13

dealings often with third parties."). Siemens is also entitled to summary judgment on Shaw's claim for damages due to lost bonuses as the disclaimer covers such damages.

## IV. CONCLUSION

I have considered the Parties' remaining arguments and find them without merit. Shaw's Motion to Strike the McGeehin Declaration is DENIED. GenOn's Motion to Strike the Ranallo Declaration is GRANTED. Siemens' Motion to Strike the Monte Declaration is DENIED. GenOn's Motion for Partial Summary Judgment is DENIED as to whether Shaw satisfied the conditions precedent to final payment and as to whether Shaw is entitled to payment of its alleged costs from the Contingency fund and is GRANTED to the extent that Shaw cannot recover amounts associated with delays attributed to GenOn prior to the date of Amendment 2. Shaw's Motion for Partial Summary Judgment is DENIED in its entirety. Siemens' Motion for Partial Summary Judgment is GRANTED in its entirety. The Clerk of the Court is directed to close these six open motions and remove them from my docket.

**SO ORDERED.**

New York, New York
April 17, 2012

Hon. Harold Baer, Jr.
U.S.D.J.