UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

GENON MID-ATLANTIC, LLC, et ano,                    :

                              Plaintiffs,           :

            - against -                             :

STONE & WEBSTER, INC.,                              :

                              Defendant.            :

--------------------------------------------------------x

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____            │
│ DATE FILED: 4/20/2012  _____   │
└─────────────────────────────────┘
```

**MEMORANDUM
DECISION AND ORDER**

11 Civ. 1299 (HB) (FM)

**FRANK MAAS**, United States Magistrate Judge.

            In this declaratory judgment action, plaintiffs GenOn Mid-Atlantic, LLC,

and GenOn Chalk Point, LLC (together, "GenOn"), seek a determination that they need

not pay defendant Stone & Webster, Inc. ("Shaw"),[1] any additional money in connection

with a construction contract, (ECF No. 1 Exs. 1-5 ("Turnkey Agreement")), between

GenOn and Shaw.  The case presently is before the Court because Shaw has moved for

sanctions against GenOn arising out of the alleged spoliation of electronically-stored

information by FTI Consulting, Inc. ("FTI"), a third-party that assisted GenOn in

connection with certain audits of Shaw's project costs and which is expected to provide

expert testimony at trial.  For the reasons set forth below, Shaw's sanctions motion, (ECF

No. 130), is DENIED.

_____

            [1]        In their papers, the parties refer to defendant Stone & Webster, Inc., as Shaw
because it is a wholly-owned subsidiary of the Shaw Group, Inc.  (See ECF No. 66 ("Am.
Compl.") ¶ 3).

I.      Relevant Facts

        In 2007, GenOn and Shaw entered into the Turnkey Agreement, which

called for Shaw to design and build certain air quality control systems, known as "wet

scrubbers," at three GenOn power plants in Maryland.  See GenOn Mid-Atlantic, LLC v.

Stone & Webster, Inc., No. 11 Civ. 1299 (HB) (FM), 2011 WL 2207513, at *1 (S.D.N.Y.

June 6, 2011) ("Genon I").  The Turnkey Agreement did not specify a fixed price for this

work; instead, Shaw's eventual compensation was to be determined using a formula that

compared Shaw's actual costs to a target cost, rewarding Shaw if it completed the work

under the target figure, but penalizing it for overruns.  The Turnkey Agreement also gave

GenOn the right to audit Shaw's requests for payment on an "Open Book" basis to

substantiate Shaw's costs and expenses.  (Turnkey Agreement §§ 1.93, 12.11.2).

        Pursuant to a letter agreement dated September 24, 2009, FTI, a national

litigation consulting firm, agreed to provide assistance to GenOn and its outside counsel,

Alston & Bird, in connection with an audit of Shaw and, potentially, a subsequent

lawsuit.  (See ECF No. 24 Ex. 1 ("Retention Letter") at 1-2).  Although the Retention

Letter was addressed to both GenOn and Alston & Bird, it made clear that Alston & Bird

was the entity retaining FTI, and that GenOn was a signatory only because it was solely

responsible for the payment of FTI's fees.  (Id.).

        The audit that FTI undertook had at least two components.  First, in October

and November 2010, FTI examined the payroll of Shaw's non-manual field personnel and

home office personnel to determine whether the hourly rates claimed for those employees

2

had, in fact, been paid (the "payroll audit").  (ECF No. 174 (GenOn Mem. in Opp'n to Mot. for Sanctions ("GenOn Mem.") Ex. 3 (Decl. of Joseph Slavis, dated Feb. 1, 2012 ("Slavis Decl."), ¶ 7))).  Second, between March and June 2011, FTI considered whether the sums that Shaw sought to recover from GenOn for payments to third-party subcontractors and vendors corresponded to the amounts reflected on the invoices that Shaw had received from those entities (the "procurement audit").  (Id. ¶ 6).  In addition to this work, Shaw also devoted some time to a "review" of Shaw's craft payroll, but, at least initially, did not consider this work to be within the scope of its formal audit assignments.  (Id. ¶ 9).

Joseph Slavis ("Slavis"), an FTI Managing Director, oversaw both the payroll and procurement audits.  (Id. ¶¶ 2, 4; Retention Letter at 2).  In connection with the procurement audit, Slavis was assisted by Eugene Planta ("Planta"), a Senior Consultant in FTI's Forensic and Litigation Consulting practice, Gil Kaplan ("Kaplan"), a Consultant in FTI's Real Estate Advisory group, and Mekonnen G-Mariam, who is no longer an FTI employee.  (ECF No. 132 (Decl. of Michael A. Branca, Esq., dated Dec. 22, 2011 ("Branca Decl."), Ex. E ("Slavis Dep.") at 26); ECF No. 194 at 2-3 (Planta Decl., dated Feb. 22, 2012 ("Planta Decl."), ¶¶ 2-3); ECF No. 194 at 4-5 (Kaplan Decl., dated Feb. 23, 2012 ("Kaplan Decl."), ¶¶ 2-3)).

On April 11, 2011, Shaw issued a subpoena duces tecum to FTI calling for the production of fourteen categories of documents.  The list of items to be produced sought essentially all of FTI's materials related to its retention and the audits that it had

3

conducted.  (ECF No. 14).[2]  That same date, Shaw served GenOn with a lengthy set of

document requests, pursuant to Rule 34 of the Federal Rules of Civil Procedure, that

included a request for "[a]ll documents comprising or pertaining to any evaluation,

analysis, or assessment, or audit of [Shaw's] costs of performance by GenOn or its

agents, including without limitation FTI Consulting."  (ECF No. 13 ¶ 43).

> Despite having previously relied on its audit rights under the Turnkey

Agreement as a justification for the payroll audit, GenOn responded by filing a motion to

quash the FTI subpoena, or alternatively for a protective order, on the ground that all of

the materials sought pursuant to the subpoena constituted work product.  (ECF Nos. 22,

24).  In its motion, GenOn argued that FTI was a non-testifying expert consultant that had

been retained in anticipation of litigation.  (ECF No. 24 at 5-8).  It was only at this stage

that Shaw learned that FTI had been retained by GenOn's outside counsel, Alston & Bird,

rather than by GenOn.  See Genon I, 2011 WL 2207513, at *2.

> It since has become clear that GenOn plans to use as expert witnesses in this

case two other FTI employees, Neil A. Gaudion and Patrick A. McGeehin.  (GenOn

Mem. at 8 & Exs. 5, 6).  According to GenOn, these witnesses were not involved in the

2010 procurement and payroll audits, having first been engaged in April 2011, five

---

[2]      Attached to the subpoena are certain emails to or from Slavis.  GenOn argues that these attachments implicitly narrowed the otherwise broad scope of the subpoena.  (GenOn Mem. at 2-3).  In its reply, Shaw contends that the email chain in fact was attached as a means of identifying the agreement between FTI and GenOn, which Shaw had not yet obtained in discovery.  (See ECF No. 182 ("Shaw Reply") at 1-3; see also ECF No. 14 at 2-3 (defining the "FTI-GenOn Agreement," in part, as relating to the work referenced in the attached email correspondence)).

months after the audit overseen by Slavis was completed.  (Id. at 8; Slavis Decl. ¶ 11).
GenOn further asserts that the testimony that these witnesses will offer focuses on Shaw's
work during time periods not covered by the 2010 audits.  (GenOn Mem. at 8).

   In an Opinion and Order dated June 6, 2011, District Judge Harold Baer, to
whom this case is assigned, found that FTI's audit paperwork was created to serve the
dual purposes of (a) determining "in the ordinary course of business . . . what was due and
owing," and (b) assessing "the availability and strength of potential legal claims."
Genon I, 2011 WL 2207513, at *3.  In view of these dual purposes, Judge Baer concluded
that the FTI papers would have been prepared in "essentially similar form" even if this
declaratory judgment action had not been filed and, thus, could not "fairly be said to have
been prepared or obtained because of the litigation."  Id. (quoting United States v.
Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998) (emphasis in Adlman)).  Judge Baer
consequently denied GenOn's motion to quash the subpoena that Shaw had served on FTI
and granted Shaw's cross-motion to compel GenOn and FTI to comply with that
subpoena (ECF Nos. 22, 36).  Id. at *4.

   Following that ruling, GenOn produced to Shaw certain documents in its
files relating to the FTI audits.  (See GenOn Mem. at 5).  Additionally, FTI produced its
documents responsive to the subpoena directly to Shaw.  At the same time, FTI also
furnished a copy of its documents to GenOn.  (Id. Ex. 2 (Decl. of Jed M. Weiss, Esq.,
dated Feb. 1, 2012 ("Weiss Decl."), ¶ 5)).

After receiving FTI's production, Shaw's counsel sent FTI's outside counsel at Cole, Schotz, Meisel, Forman & Leonard, P.A., an email inquiring why the "earliest email produced . . . was March 2010" since "FTI was retained in September 2009." (Id. Ex. A).  In a later email, Shaw's counsel noted that he had found certain "missing emails" that were "produced by GenOn but not by FTI" and continued to press for an explanation of the gaps.  (Id.).  FTI's counsel's eventual response was that FTI had "produced the responsive emails" that it maintained "in the regular course of its business."  (Id.).  FTI's counsel further noted that, if Shaw possessed any emails "by and/or between FTI and [Alston & Bird] and/or Gen[O]n" that FTI had not produced, those were "likely emails that were not maintained by FTI in the regular course of business."  (Id.).

GenOn was not privy to many of the communications between Shaw's counsel and FTI's counsel concerning the scope and adequacy of FTI's production because Shaw's counsel chose to deal directly with FTI's counsel and neither attorney copied GenOn's counsel on the emails.  (See id. ¶ 6 & Ex. A).[3]

Shaw subsequently deposed Slavis on October 14, 2011.[4]  (Slavis Dep. 1). FTI's public website describes Slavis as someone with "over 19 years of experience

---

[3]     When I asked Shaw's counsel, Mr. Branca, during a recent conference why GenOn's counsel was not copied on that email traffic, he responded that he had no "current recollection of any reason for that."  (Tr. of telephone conf. on Mar. 22, 2012, at 23).

[4]     It appears that neither Planta nor Kaplan, who assisted Slavis in connection with the procurement audit, have been deposed.  This is not surprising since Judge Baer limited each side to a total of six depositions during the fact discovery phase of this case.  (ECF No. 12).

focused primarily on Litigation Consulting Services" related to construction projects, see http://www. fticonsulting.com/global2/professionals/joseph-c-slavis.aspx (last visited Apr. 17, 2012), but his deposition testimony established that he had only limited knowledge of FTI's information management policies.  During that deposition, after Slavis testified that it was his practice "not to send emails regarding any of the case [i.e., audit] matters," and that he had adhered to that general practice in connection with the Shaw audit, Shaw's counsel sought to question him about FTI's document retention policies.  (Slavis Dep. 17-18).  Slavis responded that he was "not sure" whether FTI had an email retention policy.  (Id. at 18).  He nevertheless volunteered that he believed that his "email box [was] cleared out periodically as a matter of function," and that, if so, the emails of the FTI employees who worked with him on the Shaw audit "[p]ossibly" "may have been destroyed as well."  (Id. at 19) (emphasis added).  When he was asked, however, whether he knew "as a matter of fact" that any of his own emails had been "destroyed," Slavis responded, "I don't know."  (Id. at 20).  Slavis also indicated that he lacked any knowledge as to whether "anyone at FTI had sent any emails in the first five months of [FTI's Shaw] audit engagement."  (Id. at 21).

        Despite Slavis' uncertainty, FTI in fact has an email retention policy.  In a declaration in opposition to Shaw's motion, Lisa Crawford ("Crawford"), a Managing Director in FTI's Information Technology Group, states that "FTI's standard email storage procedure involves backing-up the entire contents of each person's Microsoft Outlook mailbox at the end of each month."  (GenOn Mem. Ex. 7 (Crawford Decl., dated

Feb. 1, 2012 ("Crawford Decl."), ¶ 3)). According to Crawford, the "imaging process includes emails contained in [each custodian's] inbox, [and] sent and deleted folders as well as other emails that may have been saved into separate and distinct folders." (Id.). These imaged emails then are stored on back-up tapes. (Id.). In responding to the Shaw subpoena in 2011, however, FTI failed to search any backup tapes. (See Weiss Decl. ¶ 8).

　　　　　In late December 2011, following the conclusion of discovery, Shaw filed the present motion, which does not seek any further discovery. Instead, Shaw seeks one of several proposed spoliation sanctions, which include, in descending order of severity, dismissing GenOn's complaint, precluding FTI from offering any expert opinions in the form of testimony or affidavits, and requiring the drawing of "an adverse inference against GenOn and any evidence offered by FTI." (ECF No. 130). Shaw also asks that if the Court "has any doubt that spoliation has occurred, it . . . order a forensic analysis of FTI's computer hard drives, at GenOn['s] and FTI's sole cost and expense." (ECF No. 131 (Shaw Mem. in Supp. of Mot. for Sanctions ("Shaw Mem.") at 2)). Finally, Shaw seeks to recover the costs and expenses associated with its motion. (ECF No. 130).

　　　　　After Shaw filed its motion, FTI attempted to restore any available backup tapes containing Slavis' emails for the twenty-month period from September 2009 (when FTI was retained) through April 2011 (when it was served with Shaw's subpoena). (See ECF No. 193 (letter to the Court from Deborah Cazan, Esq., dated Feb. 22, 2012 ("Cazan Letter I"), at 2, 4); GenOn Mem Ex. 8 (letter to Mr. Branca from Wendy F. Klein, Esq.,

dated Feb. 1, 2012 ("Klein Letter")).  Although Slavis' emails for the period should have
been stored on twenty monthly backup tapes, FTI was able to locate only fourteen tapes
that could successfully be restored.  FTI thus was unable to restore any backup data
relating to Slavis's emails for the months of December 2009 and January, February, May,
November, and December 2010.  (See Crawford Decl. ¶ 4; Cazan Letter I at 2, 4; Klein
Letter).

       Donald E. Allison ("Allison"), of KoreLogic LLC, an outside consultant
retained by FTI to verify its efforts to restore Slavis' emails from the backup tapes, has
provided a more detailed description of FTI's data processing environment and backup
protocol which helps explain why the tapes for those six months could not be restored.
(See ECF No. 196 at 2-5 (Attestation of Allison, Sr. Security Consultant for KoreLogic
LLC, dated Feb. 28, 2012)).[5]  As Allison observes, FTI maintains its electronic data on
"NetApp" data storage systems that are arrayed as storage area networks ("SANs").  Each
data storage system, in turn, is partitioned into a series of logical units identified by
Logical Unit Numbers ("LUNs").  (Id. at 1).  Using EMC's "Networker" product, FTI
attempts to back up its files from LUN to LUN and, on a weekly basis, from LUNs to
tapes.  (Id. at 1-2).  If a Networker backup fails, the system makes three additional tries
before abandoning the backup process.  At month-end, FTI selects the backup tape
successfully completed closest to the last day of the month as the monthly backup, which

---

[5]      Allison has more than twenty-five years of experience in the fields of information
technology and information technology management.  (Id. at 1).

then is stored offsite for ten years.  However, if there is no successful backup during a one-week period on either side of the last day of the month, no backup tape for that month is preserved.  Furthermore, any weekly backup tapes that have not been selected as monthly backups are retained for only four weeks before being recycled.  (Id. at 2).

According to Allison, the process of backing up the LUNs to tape may fail for a number of reasons, including the sheer volume of data being transmitted, the fact that the data is being transmitted over a long-distance network, and incompatibilities between the size of the LUN files and the capacity of the backup tape.  (Id. at 2-3).  While the automated backup process consequently is not perfect, the primary purpose of backing up FTI's data is, of course, to facilitate business continuity and disaster recovery, not to ensure that the data is preserved for litigation.  (See id. at 1).  Given these business purposes, FTI did not require that its backup process have zero defects.  Indeed, Allison observed that there were sporadic failures in the FTI backup system other than the missing six months at issue here.  (Id. at 3-4).  In his attestation, Allison opines that, despite the failure to ensure that a monthly backup is stored each month,  FTI's backup procedures constitute a "reasonable business process that makes a good faith effort to collect and backup all corporate data."  (Id. at 1-2).

After the fourteen available backup tapes were successfully restored, FTI used a utility to locate Slavis' email repositories and to extract them into a single Microsoft Personal Storage (PST) file for each tape.  (See id. at 3).  FTI's counsel then searched those PST files and other Microsoft Outlook files on FTI's active drives to

10

locate any additional emails related to the Shaw audit.  FTI ultimately produced a total of

551 additional emails and one calendar request to Shaw.  This further production included

certain emails that FTI previously had concluded were not responsive to Shaw's subpoena

during its earlier review of the data on its custodians' active drives.  (Cazan Letter I at 1-

2; Klein Letter).  Among the new materials provided by FTI were emails relating to the

craft payroll review that FTI earlier had considered unrelated to the audits that it had

conducted for GenOn.  (Klein Letter).

Of the 552 additional documents produced to Shaw by FTI, all but 45

emails and one calendar request resided on FTI's active drives.  In other words, 506 of the

documents had not been deleted; they simply had not been produced previously, either

because FTI considered them non-responsive or as a result of oversight.  (See Cazan

Letter I at 1; ECF No. 197 (letter to the Court from Ms. Cazan, dated Mar. 23, 2012

("Cazan Letter II"), at 1)).

Of the 46 documents that existed solely on the backup tapes, only ten had

not previously been produced to Shaw by GenOn as part of its own document production

after Judge Baer rejected GenOn's work product claim.  (Cazan Letter I at 1).  Of those

ten documents, two were emails between Slavis and a Shaw employee, of which Shaw

presumably was aware before FTI made its supplemental production.  Another three

emails related to a non-disclosure agreement that Shaw asked FTI to sign before

commencing the audit and thus do not pertain directly to the audit itself.  FTI represents

that "there is only one email pertaining to the audit that Shaw did not already have in its

possession and that was located solely on the backup tapes."  (<u>Id.</u> at 2 (underscoring in original; boldface omitted); Cazan Letter II at 1 & Doc. 46).  That email, dated September 27, 2010, reflects Planta's response to an email that Slavis had sent him earlier that day. In the first email, which evidently had been produced, Slavis complained that he was having difficulty locating certain subcontracts and change orders (relating to "Newtron") that had not been produced in hard copy form.  (<u>See</u> Cazan Letter II Doc. 46).  In the previously-unproduced responsive email, Planta advised Slavis that the Newtron files were "already in" and could be found under "Client Files/Subcontracts."  (<u>Id.</u>).

Although it undertook a detailed further review of its electronic information regarding Slavis after the motion was filed, FTI has not attempted to restore or search any backup tapes relating to Planta's or Kaplan's email to recover additional information that may have been deleted from their active drives.  As part of its opposition to Shaw's motion, however, GenOn has submitted the declarations of Planta and Kaplan.  In those declarations, Planta and Kaplan indicate that they responded to Shaw's subpoena by turning over to in-house counsel "all documents and emails related in any way to [their] work for GenOn, including emails in [their] inbox[es], [and] sent[] and deleted folders." (Planta Decl. ¶ 4; Kaplan Decl. ¶ 4).  Planta further represents that he did not purge any substantive emails relating to the GenOn audit from his deleted folder, (Planta Decl. ¶ 5), and Kaplan states that it is not his general practice to delete any emails from his deleted folder and that he does not recall purging any GenOn-related emails from his deleted folder (Kaplan Decl. ¶ 5).  Both custodians also declare that, "[t]o the best of [their]

knowledge, all responsive documents and emails from or to [them], including emails with Joseph Slavis, related to [their] substantive work on the audit were produced by FTI." (Planta Decl. ¶ 6; Kaplan Decl. ¶ 6).

II.   <u>Discussion</u>

    A.   <u>Introduction</u>

        Spoliation, which is scarcely a new concept, traces its roots to the Latin legal maxim <u>omnia</u> <u>praesumuntur</u> <u>contra</u> <u>spoliatorem</u> ("all things are presumed against a wrongdoer").  <u>See, e.g.</u>, N.Y.S. Bar Ass'n, <u>Report of the Special Comm. on Discovery and Case Mgmt. in Federal Litigation</u> 13 (Apr. 2, 2012), <u>available at</u> http://www.nysba.org/AM/Template.cfm?Section=Final_Report_of_the_Special_Committee_on_Discovery_and_Case_Management_in_Federal_Litigation; Kevin Eng, <u>Spoliation of Electronic Evidence</u>, 5 B.U. J. Sci. & Tech. L. 13, para. 1 (1999).  The doctrine of spoliation has, however, assumed greater importance in recent years as more information has come to be created and stored electronically.  Although a recent study confirms that spoliation motions are becoming increasingly common in federal litigation in the era of e-discovery, <u>see, e.g.</u>, Dan H. Willoughby, Jr., Rose Hunter Jones & Gregory R. Antine, <u>Sanctions for E-Discovery Violations: By the Numbers</u>, 60 Duke L.J. 789, 794 (2010) ("Our analysis of pre-2010 cases [in federal court] indicates that there were more e-discovery sanction cases (ninety-seven) and more e-discovery sanction awards (forty-six) in 2009 than in . . .  all the years prior to 2005 combined."), the absolute number of spoliation motions remains quite small, <u>see</u> Emery G. Lee III, Fed. Judicial Ctr., <u>Motions</u>

13

for Sanctions Based on Spoliation of Evidence in Civil Cases 4 (2011), available at

http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/DallasMiniConf_Empirical_Da

ta/Federal%20Judicial%20Center.pdf (finding that during 2007-2008 spoliation motions

were filed in 0.15 percent of civil cases in nineteen districts participating in a study).  This

is hardly surprising since, as this case shows, not every failure to preserve electronic

evidence constitutes sanctionable spoliation.

      **B.**    <u>Elements of a Spoliation Claim</u>

      To secure spoliation sanctions based on the destruction or delayed

production of evidence, a moving party must prove that (1) the party having control over

the evidence had an obligation to preserve or timely produce it; (2) the party that

destroyed or failed to produce the evidence in a timely manner had a "culpable state of

mind"; and (3) the missing evidence is "relevant" to the moving party's claim or defense,

"such that a reasonable trier of fact could find that it would support that claim or

defense."  <u>Residential Funding Corp. v. DeGeorge Fin. Corp.</u>, 306 F.3d 99, 107 (2d Cir.

2000); <u>Kullman v. New York</u>, No. 8:07-cv-716 (GLS/RFT), 2012 WL 1142899, at *1

(N.D.N.Y. Apr. 4, 2012) (citing <u>Twitty v. Salius</u>, No. 11-448, 2012 WL 147913, at *1 (2d

Cir. Jan. 19, 2012)).  Although courts disagree as to the level of culpability that must be

shown to secure particular sanctions, <u>see, e.g.</u>, <u>Victor Stanley, Inc. v. Creative Pipe, Inc.</u>,

269 F.R.D. 497, 516 (D. Md. 2010) (lamenting the "lack of a national standard, or even a

consensus among courts in different jurisdictions about what standards should govern

preservation/spoliation issues"); <u>Rimkus Consulting Grp. v. Cammarata</u>, 688 F. Supp. 2d

14

598, 614 (S.D. Tex. 2010) (identifying six circuits holding that mere negligence is not

enough to warrant an adverse inference instruction), it is clear that even the mere

negligent destruction of evidence may be sufficient to warrant sanctions in the Second

Circuit. Residential Funding, 306 F.3d at 108. Nonetheless, a court should never impose

spoliation sanctions of any sort unless there has been a showing – inferential or otherwise

– that the movant has suffered prejudice. See Orbit One Commc'ns, Inc. v. Numerex

Corp., 271 F.R.D. 429, 431 (S.D.N.Y. 2010) ("No matter how inadequate a party's efforts

at preservation may be, . . . sanctions are not warranted unless there is proof that some

information of significance has actually been lost."); id. at 441 ("It is difficult to see why

even a party who destroys information purposefully or is grossly negligent should be

sanctioned where there has been no showing that the information was at least minimally

relevant.").

        With these precepts in mind, I will turn to the elements of spoliation that

Shaw must prove to secure the relief it seeks.

        1.      GenOn's Responsibility for FTI's Alleged Misconduct

        The first element that Shaw must establish is that GenOn had control of the

missing evidence and a duty to preserve and produce it. Residential Funding, 306 F.3d at

107. Shaw advances two arguments in this regard. First, Shaw suggests that GenOn

should be held responsible for any failure on the part of FTI to preserve or produce

evidence, even if GenOn itself was not at fault, because FTI was acting as GenOn's agent.

(Shaw Mem. at 11; Reply at 3-4, 6-7). Second, Shaw contends that GenOn had both

practical and legal control of FTI's information by virtue of its retention of FTI as its audit expert, and therefore had an obligation to cause FTI to preserve and produce the information.  (Shaw Mem. at 12-13; Shaw Reply at 4-6).  I will address GenOn's duty to preserve before turning to its duty to produce information.

a.    <u>Duty to Preserve</u>

Shaw's argument with respect to preservation is that GenOn should have directed FTI to preserve its evidence long before the subpoena was issued because GenOn reasonably anticipated litigation as early as 2009,[6] by which time (i) FTI was functioning as its agent, and (ii) GenOn had legal and practical control over FTI's information.  (Shaw Mem. at 11-13; Shaw Reply at 3-7).

In <u>Trigon Insurance Company v. United States</u>, 204 F.R.D. 277 (E.D. Va. 2001), the court addressed a similar agency claim.  In that case, the Government retained an economics consulting firm to assist it in the defense of a suit brought by a company seeking a refund of federal income taxes that it alleged had been improperly assessed.  <u>Id.</u> at 279-80.  As here, the consulting firm ostensibly was hired as a non-testifying expert.  In addition, the Government separately retained the president of the consulting firm as one of its testifying experts.  <u>Id.</u> at 280.  Under the version of Rule 26(a)(2) of the Federal Rules of Civil Procedure then in effect, the plaintiff was entitled to all of the testifying

---

[6]    Shaw maintains that GenOn has essentially conceded that its duty to preserve FTI's files arose as early as 2009 by arguing before Judge Baer – albeit, unsuccessfully – that the FTI audits constituted work product prepared at the direction of Alston & Bird in anticipation of litigation.  (Shaw Mem. at 13; Shaw Reply at 3-4 (citing ECF Nos. 24, 38, 42)).

16

expert's draft reports.[7]  In addition to those drafts, the plaintiff also sought the production of any communications among the Government's experts and any documents that the experts had reviewed.  Id. at 280-81.  Although certain such materials were produced, by the time the Government instructed the experts to preserve their files, "many of the communications and draft reports had been deleted as a result of the [consulting firm's] document retention policy and the individual practices of each of the testifying experts." Id. at 281.

On these facts, the court held that the Government had a duty to preserve its experts' files, both by virtue of Rule 26 and because the taxpayer had given the Government notice that it wanted the materials.  The court further concluded that the Government could not pass the buck to the consulting firm because it was acting as "the agent of the United States in arranging for the expert testimony to be given in [the] action on behalf of the United States."  Id. at 289.  Among the sanctions that the court imposed was an order that precluded the consulting firm from any further participation in aspects of the case relating to expert testimony and permitted the drawing of an adverse inference at trial with respect to the experts' testimony and credibility.  Id. at 291.

---

[7]    Rule 26(b)(4) of the Federal Rules of Civil Procedure subsequently was amended in 2010 to exempt from discovery any drafts of any expert report (or disclosure) required under Rule 26(a)(2), and, with certain limited exceptions, any communications between a party's attorney and its expert witnesses.  See Rule 26 Adv. Comm. Note to 2010 Amendments.  As the Advisory Committee observed, prior to the amendment of the rule, attorneys often would "employ two sets of experts – one for purposes of consultation and another to testify at trial – because disclosure of their collaborative interactions with expert consultants would reveal their most sensitive and confidential cases analyses."  Id.

More recently, in Goodman v. Praxair Services, Inc., 632 F. Supp. 2d 494 (D. Md. 2009), a pro se plaintiff sought spoliation sanctions based, in part, on the defendant's "fail[ure] to issue a litigation hold to its 'key players' and third-party consultants." Id. at 497 (emphasis added). The case arose out of an alleged agreement that the defendant's predecessor would pay the plaintiff a $50,000 success fee if he was able to secure from the United States Environmental Protection Agency ("EPA") an exemption from a Clean Air Act regulation under which the defendant's products would have been classified as "fuel additives." Over time, rather than relying solely on the plaintiff, the predecessor corporation enlisted the services of other consultants, including a former EPA attorney. Id. at 500-01. After the EPA relented, finding that the defendant's products were not fuel additives, the plaintiff threatened suit because he had not been paid the success fee. Id. at 502-03. At some point thereafter, the defendant corporation's chief executive officer ceased deleting her own documents relating to the dispute after conferring with counsel, but she did not instruct any of the defendant's other employees or any of its other consultants to implement a litigation hold. Id.

Addressing whether the duty to preserve extended to the additional third-party consultants retained by the defendant, Magistrate Judge Paul W. Grimm noted that there was Fourth Circuit authority indicating that even if a party could not preserve because he lacked ownership or control of the potential evidence, "he still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation involving that evidence. Id.

18

at 514 (citing <u>Silvestri v. Gen. Motors Corp.</u>, 271 F.R.D. 583, 591 (4th Cir. 2001)).[8]

Judge Grimm further concluded that a party has control over documents when it has the

"right, authority, or practical ability to obtain the documents from a non-party to the

action." <u>Id.</u> (quoting <u>In re NTL Sec. Litig.</u>, 244 F.R.D. 179, 195 (S.D.N.Y. 2007) (Peck,

Mag. J.)).  Finding that the defendant had neither legal control over the third-party

consultants' documents, nor the practical ability to cause them to preserve those

documents, Judge Grimm denied the plaintiff's spoliation motion insofar as it was based

on the destruction of such documents.  <u>Id.</u> at 515-16.

    Shaw argues that GenOn had both legal and practical control over FTI's

information concerning the audit and, therefore, should have directed FTI to take steps to

preserve that information.  (Shaw Reply at 4-5).  To prevail on this argument, it is

sufficient for Shaw to establish that GenOn had <u>either</u> the legal right or the practical

ability to obtain FTI's materials.  <u>See</u> <u>In re NTL Sec. Litig.</u>, 244 F.R.D. at 195; <u>Golden

Trade, S.r.L. v. Lee Apparel Co.</u>, 143 F.R.D. 514, 525 (S.D.N.Y. 1992).

    With respect to the issue of legal control, Shaw points to the Retention

Letter, pursuant to which FTI agreed to serve as a consultant to Alston & Bird in

---

    [8]    In this case, there obviously was no need for GenOn to notify Shaw that there
might be information concerning the audit results in FTI's possession since Shaw was fully
aware of FTI's audit-related activities.  Indeed, Shaw had served FTI with a subpoena seeking
those materials many months before it brought its spoliation motion against GenOn.

connection with Alston & Bird's representation of GenOn.  Insofar as relevant, the

Retention Letter provides that:

> It is agreed that FTI materials and all other working papers
> and other documents prepared by FTI pursuant to this
> Engagement will be maintained as confidential materials and
> will not be disclosed to third parties without Counsel's
> consent, except as may be required by law, regulation, or
> judicial or administrative process.  Unless prohibited by law,
> FTI agrees to notify Counsel promptly of any of the following
> events:  (a) a request by anyone to examine, inspect, or copy
> such documents or records; or (b) any attempt to serve, or the
> actual service of, any court order, subpoena, or summons
> upon FTI that requires the production of such documents or
> records.  It is further understood that all opinions and work
> product of FTI shared with Counsel or the Client shall be
> maintained as confidential and shall not be shared with any
> other person or entity.

(Retention Letter at 5).   Contrary to Shaw's contentions, the fact that FTI agreed to treat

its audit work product as confidential, and to provide Alston & Bird with advance notice

of subpoenas such as the one served by Shaw, does not establish that GenOn was granted

any legal rights with respect to FTI's information regarding its audit of Shaw.  Moreover,

the provisions relating to the confidentiality of FTI's audit materials do not indicate that

FTI had an affirmative duty to furnish those materials to GenOn at its request or that of

Alston & Bird.  Shaw therefore has failed to establish that GenOn had legal control over

FTI's audit-related information.

    The issue of practical control presents a closer question.  Although there is

no direct evidence that GenOn could have obtained FTI's audit-related materials merely

by asking for them, or that FTI necessarily would have honored a request by GenOn that

they be preserved, common sense suggests that this is likely.  FTI had not simply

performed a single discrete assignment for GenOn.  Quite to the contrary, FTI had been

engaged to review Shaw's craft payroll and conduct a two-pronged audit, and it

subsequently also agreed to provide expert testimony on GenOn's behalf at trial.  The

relationship between FTI and GenOn/Alston & Bird therefore was and remains ongoing.

Moreover, FTI holds itself out as an entity that is knowledgeable about litigation.  In light

of FTI's continuing relationship with GenOn, and its role as a litigation consultant, there

seems to be little doubt that FTI would have complied with a timely request by GenOn to

preserve its information.  I therefore conclude, at least for present purposes, that Shaw has

met its burden of establishing that FTI's materials related to the audit were within

GenOn's practical control.  It follows that GenOn had a duty to ensure that those

materials were adequately preserved.[9]  See The Sedona Conference Commentary on

Legal Holds:  The Trigger and the Process, reprinted in 11 Sedona Conf. J. 265, 279

(2010), Guideline 6, available at https://thesedonaconference.org/system/files/sites/

sedona.civicactions.net/files/private/drupal/filesys/publications/legal_holds_sept_2010.

---

[9]        Because I have concluded that GenOn was under a duty to preserve based on its
practical control over audit material in FTI's possession, I need not determine whether an agency
relationship existed between GenOn and FTI.

pdf ("The duty to preserve involves reasonable and good faith efforts, taken as soon as is practicable and applied proportionately, to identify and, as necessary, notify persons likely to have relevant information to preserve the information.").[10]

        b.    Duty to Produce

        Turning to GenOn's production obligations, it is settled law that a party must produce not only all documents in its possession, but also all documents within its practical control.  See Shcherbakovskiy v. Da Capo Al Fine, Ltd., 490 F.3d 130, 138 (2d Cir. 2007) ( "[I]f a party has access and the practical ability to possess documents not available to the party seeking them, production may be required.").  Accordingly, in ordinary circumstances GenOn's discovery obligations may well have required it to take the extra step of securing any additional documents responsive to Shaw's document requests directly from FTI, which was continuing to serve as GenOn's litigation consultant, and to produce them.

        In this case, however, Shaw had subpoenaed FTI for its documents.  (ECF No. 14).  Moreover, after Judge Baer granted Shaw's motion to compel, Shaw's counsel sent GenOn's counsel an email stating that it expected GenOn to produce immediately "all FTI-related documents dating back to September 2009," "whether they [were] in the custody of GenOn or [Alston & Bird]."  Significantly, Shaw's counsel did not ask GenOn

---

[10]     As the Commentary to Guideline 6 cautions:  "Some sources of information under the control of third parties may also be deemed to be within the control of the organization because of contractual or other relationships. . . .  With respect to those sources, the organization should consider providing appropriate notice concerning the need to preserve material that is likely to be relevant.  Id.

to produce any documents that were then held by FTI, stating instead that "[Shaw] will be contacting FTI directly to enforce the subpoena."  (See Cazan Letter II (attaching email dated June 6, 2011, from Mr. Branca to Ms. Cazan and others)).  Consistent with this representation, Shaw's counsel soon began communicating directly with FTI's counsel concerning perceived deficiencies in FTI's production without copying GenOn's counsel on his emails.  (See Weiss Decl. Ex. A).  Having negotiated directly with FTI concerning its subpoena, and having chosen to exclude GenOn from many of those discussions, Shaw cannot reasonably complain that GenOn withheld any FTI documents that should have been produced.  See Shcherbakovskiy, 490 F.3d at 138 ("[I]t [is] fairly obvious that a party also need not seek such documents from third parties if compulsory process against the third parties is available to the party seeking the documents.").  Indeed, the record establishes that GenOn's own document production included many of the documents that FTI failed to produce in response to the subpoena.

The Court therefore concludes that GenOn had an obligation to cause FTI to preserve its information, but is not liable for any unrelated shortcomings in FTI's actual production to Shaw.

2.      GenOn's Degree of Culpability

The next question the Court must consider is whether GenOn acted with a culpable state of mind, i.e., at least negligently, by failing to cause FTI to preserve its information.

In prior submissions to this Court, GenOn flatly declared that it "first anticipated litigation with Shaw in January 2009."  (ECF No. 78 at 26).  As GenOn explained, the parties initial dispute was resolved on June 12, 2009, but only seven days later GenOn "requested assistance from Alston & Bird."  (Id. at 26-27).  Although the scope of Alston & Bird's engagement subsequently varied over time, GenOn conceded in its prior papers that it "began to anticipate elements of this very litigation in mid-2009." (Id. at 29).  If so, GenOn's duty to preserve unquestionably arose at that time.  In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 93, 148 (2d Cir. 2008) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.") (quoting Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001)); see also Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc., 473 F.3d 450, 457 (2d Cir. 2007) ("Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.") (quoting West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999)) (internal quotation marks omitted).  Despite that duty, Shaw indicates (and GenOn apparently does not dispute) that GenOn failed to issue a litigation hold letter until May 2011.  (Shaw Mem. at 13 n.11).  There also is no indication that GenOn ever instructed FTI to preserve its material.

In <u>Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, LLC</u>, 685 F. Supp. 2d 456 (S.D.N.Y. 2010), Judge Scheindlin suggested that after the duty to preserve has attached, it is gross negligence not

> to issue a written litigation hold; to identify all of the key players and to ensure that their electronic and paper records are preserved; to cease the deletion of email or to preserve the records of former employees that are in a party's possession, custody, or control; and to preserve backup tapes when they are the sole source of relevant information or when they relate to key players, if the relevant information maintained by those players is not obtainable from readily accessible sources.

<u>Id.</u> at 471 (emphasis added).  Here, at least two of the oversights characterized by Judge Scheindlin as gross negligence arguably occurred after GenOn contemplated litigation since GenOn did not cause FTI to issue a litigation hold letter to its personnel and did not take steps to ensure that Slavis' records were preserved.  Nonetheless, the particular circumstances of this case suggest that a categorical designation of GenOn's omissions as gross negligence may not be warranted.  At the outset, GenOn and its counsel may reasonably have expected that FTI, which advertises itself as a firm with litigation consulting expertise, (<u>see</u> Branca Decl. Ex. F), would be aware of the rules governing a party's discovery conduct and take steps to ensure that it did not cause GenOn to run afoul of them.  GenOn and its counsel also may have believed – mistakenly, as it turns out – that Slavis and his audit assistants were not "key players" because FTI had been retained by Alston & Bird to serve as a non-testifying expert.  Finally, whatever Genon's shortcomings with respect to FTI's information may have been, there is no suggestion

that GenOn failed to preserve and produce all of its own documents, many of which came from FTI.

      I note these mitigating factors principally because certain courts have questioned the bright-line culpability rules that Judge Scheindlin promulgated in Pension Committee.  See Surowiec v. Capital Title Agency, Inc., 790 F. Supp. 2d 997, 1007 (D. Ariz. 2011) ("The Court disagrees with Pension Committee's holding that a failure to issue a litigation hold constitutes gross negligence per se."); Haynes v. Dart, No. 08 C 4834, 2010 WL 140387, at *4 (N.D. Ill. Jan. 11, 2010) ("The failure to institute a document retention policy, in the form of a litigation hold, is relevant to the court's consideration, but it is not per se evidence of sanctionable conduct."); see also Orbit One Commc'ns, 271 F.R.D. at 441 (failure to abide by contemporary preservation standards described in Pension Committee does not necessarily constitute negligence, "depending upon the circumstances of an individual case").  Nevertheless, even if GenOn's actions or failures to act do not rise to the level gross negligence, its conceded failure to take any steps beyond FTI's general backup procedures to ensure that Slavis' emails were preserved, even after litigation was anticipated, plainly constitutes negligence.  See Toussie v. Cnty. of Suffolk, No. CV 01-6716 (JS) (ARL), 2007 WL 4565160, at *8 (E.D.N.Y. Dec. 21, 2007).  Shaw therefore has established that GenOn acted with a degree of culpability sufficient to permit the imposition of sanctions by this Court.  See Residential Funding, 306 F.3d at 108.

3.     Relevance of Allegedly Destroyed Documents

Even if a party's culpability is established, for sanctions to be imposed, the Court must find that relevant evidence "actually existed and was destroyed."  See Orbit One Commc'ns, 271 F.R.D. at 441 (quoting Farella v. City of N.Y., Nos. 05 Civ. 5711 & 05 Civ. 8264 (NRB), 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007)).  Shaw, of course, bears the burden of proof as to this element of its spoliation claim.  See id.  In that regard, if GenOn's failure to preserve FTI's electronically-stored information rises to the level of gross negligence, Shaw would be entitled to a rebuttable presumption that any missing evidence would have been favorable to Shaw.  See Residential Funding, 306 F.3d at 109. On the other hand, if GenOn merely was ordinarily negligent in carrying out its preservation obligations, that presumption would not apply.  See Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 221 (S.D.N.Y. 2003) (in the absence of sufficiently egregious conduct, the party seeking sanctions must "demonstrate that a reasonable trier of fact could find that the missing [evidence] would support [its] claims"); Great N. Ins. Co. v. Power Cooling, Inc., No. 06-CV-874 (ERK) (KAM), 2007 WL 2687666, at *11 (E.D.N.Y. Sept. 10, 2007) (where evidence was destroyed as a result of ordinary negligence, "there must be extrinsic evidence to demonstrate that the destroyed evidence was relevant and would have been unfavorable to the destroying party").

In an effort to establish that relevant evidence is missing, and that Shaw consequently has been prejudiced, Shaw points to Slavis' deposition testimony, as well as the fact that FTI failed to produce any emails from backup tapes for many of the months

27

for which FTI attempted to recover data. (Shaw Mem. at 6-9; ECF No. 198 (letter to the Court from Mr. Branca, dated Mar. 23, 2012 ("Branca Letter"), at 2)). Neither of these alleged bases for an award of sanctions withstands scrutiny.

As noted previously, Shaw alleges that Slavis confirmed during his deposition that "FTI communicated using e-mails, and that he did not have all of the e-mails during the time period of his audit work." (Shaw Mem. at 5 (citing Slavis Dep. 17-19)). Slavis actually testified, however, that he generally did not engage in substantive communications by email with respect to the GenOn audit or other audits. (Slavis Dep. 17-18). Moreover, although Slavis believed that his email box was "cleared out periodically as a matter of function," he conceded that he lacked any first-hand knowledge as to whether that was so.[11]  (Id. at 17-20). Slavis' conjecture that the emails on FTI's active drives may have been periodically deleted by FTI's systems managers consequently does not constitute proof that this actually occurred. Indeed, despite the lengthy submissions that both sides have made in this case, the record appears to be totally silent as to whether any emails on the active drives of FTI's custodians were periodically deleted when they reached a certain age.[12]  The Court cannot assume that this

---

[11]      In its papers, Shaw suggests that Slavis' testimony that he was unaware of FTI's document retention policy should be considered "suspect" since FTI advertises itself as a litigation consultant. (Shaw Mem. at 8). The fact that Slavis may be knowledgeable about construction auditing, however, scarcely means that Slavis' testimony was fabricated.

[12]      As Shaw itself concedes in its reply papers, one of the questions that remains unanswered even at this stage is: "Were email boxes routinely purged before or after the monthly backup?" (Reply Mem. at 9).

is so merely because such automatic deletion protocols may be commonplace in large institutions.[13]

To be sure, there is evidence that 45 emails and one calendar request were found on the fourteen restored Slavis backup tapes, but nowhere else among FTI's active data sources. As Shaw correctly observes, this means that these items must have been "double deleted," that is, intentionally removed by Slavis from both his inbox and his deleted folder. (See Branca Letter at 1). All but ten of those emails, however, were produced to Shaw by GenOn during the course of discovery. Since Shaw received these emails, the mere fact that they were not produced from Slavis' active files obviously could not have prejudiced Shaw.

Shaw also argues that it has been prejudiced because there were no monthly backup tapes of Slavis' email activity for six of the months that FTI attempted to restore and, consequently, there is no way to know whether Shaw has been deprived of relevant evidence. Slavis, however, was not in a position to know which of his double-deleted emails FTI's technicians would be able to restore. Since seventy percent of the potentially relevant tapes have been restored, they provide a reasonable basis for determining whether there is, in fact, reason to believe that relevant information was destroyed.

---

[13]    For example, in Fiscal Year 2010, the United States Courts had more than 30,000 employees. See Admin. Office of the U.S. Courts, The Judiciary Fair Employment Practices Annual Report 7 (Fiscal Year 2010). Nonetheless, despite the scale of the enterprise, my emails remain on my active drive without any time limitations unless I take affirmative steps to delete them.

Having reviewed each of the 45 emails restored from the backup tapes, my conclusion is that Shaw's characterization of them as going to "the heart of this case" is vastly overblown.  Indeed, if anything, the emails confirm Slavis' assertion that he did not use email to engage in substantive communications about the audit.  Many of the emails thus deal with administrative minutiae, such as arranging internet access for visiting FTI personnel at GenOn's facilities, ensuring the prompt receipt of a confidentiality agreement that Shaw had asked FTI to sign prior to commencing its audit, problems synchronizing various custodians' Microsoft Outlook calendars, and confirming the locations on FTI's databases where various Shaw documents and files could be found.

The limited probative value of the "double deleted" documents is even more persuasively demonstrated by those that Shaw chose to highlight after GenOn identified which of the documents comprising FTI's further production had not been retrieved from FTI's active data.  Shaw points to four such emails.  In three of those emails, Slavis merely is forwarding to GenOn either audit summaries or other analyses of Shaw's data.  (Id. at 1-2).  Significantly, Shaw does not suggest that it did not receive the attachments to those emails during the course of discovery.  The emails transmitting those attachments therefore are no more relevant to the issues in this case than the non-substantive cover letters that counsel routinely employ to send courtesy copies of motion papers to the Court.

Shaw also points to an email dated October 7, 2010, in which Slavis responded to GenOn's request for a completion date for each of FTI's submittals by

30

providing a six- to eight-week estimate.  (<u>Id.</u> at 2).  In that email, Slavis further noted that "there is a lot of info that we received and since we have all focused on this as the best opportunity for cost recovery, I would like to make sure we turn over every stone we can."  (<u>Id.</u> (citing Cazan Letter II Doc. 4)).  In Shaw's view, the email is therefore particularly significant since it "casts doubt on the independence of FTI in the performance of the contract audit and establishes the true goal of FTI's engagement." (<u>Id.</u>).

Significantly however, as even Shaw is forced to admit, both the October 7 email and the other three emails that Shaw contends go to the heart of this case <u>were</u> produced by GenOn during discovery.  (<u>See</u> <u>id.</u> ("Shaw did receive these emails from GenOn in discovery."); Weiss Decl. ¶¶ 5, 7).  It follows that even if these emails are relevant, there has been no spoliation of them by GenOn.  <u>See</u> <u>Zubulake</u>, 220 F.R.D. at 218 ("A party or anticipated party must retain all relevant documents (<u>but not multiple</u> <u>identical copies</u>) in existence at the time the duty to preserve attaches . . . .") (emphasis added); <u>see also</u> <u>Orbit One Commc'ns</u>, 271 F.R.D. at 442 (removal of a desktop and hard drive did not amount to spoliation because the information was preserved in other locations and the desktop was ultimately recovered and produced).

Finally, there is one audit-related document that was double-deleted by Slavis and not produced to Shaw by GenOn or any other custodian prior to the filing of Shaw's spoliation motion.  (Cazan Letter II Doc. 46).  That email, sent by Planta to Slavis on September 27, 2010, advised Slavis of the location of certain contracts and change

orders relating to "Newtron" that had been produced to FTI by Shaw.  In fact, the subject of both Slavis' email and Planta's responsive email is "[S]haw data."  (Id.).  Inasmuch as Shaw was the source of the data, the failure to preserve and produce this email could not have prejudiced Shaw.

Turning to Planta and Kaplan, while FTI admittedly took no steps to restore any backup tapes containing their emails, there has been no showing that any information relating to their work on the procurement audit could not be produced from their current Outlook mailboxes.  Indeed, the uncontroverted evidence is that "all documents and emails related in any way to [their] work for GenOn, including emails in [their] inbox[es], [and] sent[] and deleted folders," were produced to FTI's in-house counsel.  (Planta Decl. ¶ 4; Kaplan Decl. ¶ 4).  In the absence of any showing that in-house counsel improperly withheld that information, there is no basis to conclude that relevant information relating to these custodians was spoliated.

In sum, to the extent that Slavis' emails were double-deleted, the tapes that were restored confirm his testimony that it was not his practice to communicate substantively about audits via email.  The somewhat random sample of restored emails also refutes the suggestion that valuable information was lost due to FTI's failure to preserve Slavis' active email data.  There further is no evidence that any of Planta's or Kaplan's emails concerning the Shaw procurement audit were not available through a search of their current Outlook mailboxes.  In these circumstances, even if it was gross negligence for FTI not to take steps to preserve all of Slavis' information relating to the

32

payroll and procurement audits, thereby leading to a presumption that relevant evidence was spoliated, GenOn and FTI have fully rebutted the suggestion that Shaw was prejudiced.

III.   Conclusion

For the foregoing reasons, Shaw's motion for spoliation sanctions, (ECF No. 130), is DENIED.

SO ORDERED.

Dated:        New York, New York
              April 20, 2012

_____
FRANK MAAS
United States Magistrate Judge

Copies to:

Hon. Harold Baer, Jr.
United States District Judge

Deborah Cazan, Esq.
John I. Spangler, III, Esq.
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia  30309

Michael Andrew Branca, Esq.
Peckar & Abramson, P.C.
Two Lafayette Centre
1133 21st Street, N.W., Suite 500
Washington, D.C. 20036